IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TOMMY RAY HOOK and
CHARLES MONTANO,

                    Plaintiffs,

vs.                                                    No. CIV. 05-356 JH/WPL

THE REGENTS OF THE UNIVERSITY
OF CALIFORNIA d/b/a LOS ALAMOS
NATIONAL LABORATORY, et al.,

                    Defendants.

## MEMORANDUM OPINION AND ORDER

The subjects of this Memorandum Opinion and Order are *Defendant Bani Chatterjee's Motion for Summary Judgment on Claims by Tommy Hook Based on Qualified Immunity and Other Grounds* [Doc. No. 91], *Defendant Bani Chatterjee's Motion for Summary Judgment on Claims by Charles Montano Based on Qualified Immunity and Other Grounds* [Doc. No. 93], and Defendants' *Motion and Memorandum of Law in Support of Defendants' Motion to Strike Inadmissible Evidence Submitted in Response to Defendant Bani Chatterjee's Motion for Summary Judgment* [Doc. No. 149]. After considering the law, the evidence, and the arguments of counsel, the Court concludes that the motion to strike should be granted in large part, although it will also be denied in part. Defendant Chatterjee's motion for summary judgment on both Hook's and Montano's claims will be granted.

## INTRODUCTION

In reviewing the motions listed above, the Court is astonished by the scattershot approach employed by counsel for Plaintiffs in litigating this matter. The subject of the two motions for

summary judgment at hand are Plaintiffs' claims against a single defendant, Bani Chatterjee ("Chatterjee"). In response to the two separate motions for summary judgment, Plaintiffs filed a single, joint response. Although there is nothing inherently improper about that choice, the Court finds Plaintiffs' execution of that strategy to be questionable. Plaintiffs' joint brief contains over eleven pages of introduction and background facts and more than twelve pages of Plaintiffs' "counterstatement of material facts," yet significant portions of these sections of the Plaintiffs' brief have nothing to do with allegedly illegal acts by Defendant Chatterjee. Instead, the Plaintiffs spend significant time discussing the actions of Chatterjee's co-defendants, a subject not relevant here. Similarly, Plaintiffs chose to support their brief with exhibits and affidavits that contain a large amount of inadmissible evidence and evidence that is irrelevant to Chatterjee. This scattershot approach has not only clouded the relevant issues, but also has made the Court's job considerably more complicated, as Plaintiffs have forced the Court to filter through voluminous pages of argument and supporting evidence in order to ferret out those portions that are actually relevant to the claims against Chatterjee. The Court now regrets its June 21, 2006 Order [Doc. No. 135] granting in part Plaintiffs' motion to exceed page limits, and shudders to imagine what Plaintiffs would have filed if the Court had acceded to their original request to file a 55-page brief and 650 pages of exhibits. Plaintiffs defend this approach by arguing that their intent was to make Court's job easier by attaching "master affidavits" to their joint response to Chatterjee's summary judgment motions and then referring to those affidavits in responding to the summary judgment motions of the other defendants. However, in the end Plaintiffs Hook and Montano each filed three separate affidavits along with a chart [see attachment to Doc. No. 161] to explain the locations of the exhibits Plaintiffs failed to attach to their affidavits, all of which has resulted in a confusing muddle.

In any event, it is incumbent upon the Court to warn counsel for Plaintiffs that these litigation tactics are improper, and to admonish counsel not to repeat those tactics in the future.

## **DISCUSSION**

## I.   **MOTION TO STRIKE**

Defendants[1] move to strike exhibits that Plaintiffs attached to Doc. No. 138, which is Plaintiffs' joint response to Chatterjee's motions for summary judgment.  Defendants ask the Court to strike some exhibits entirely, and to strike portions of others, because they either contain inadmissible hearsay not subject to any exception to the hearsay rule, they are irrelevant, they are not based upon personal knowledge, they contain conclusory statements made without proper foundation, they contain improper argument, they contradict the speaker's prior deposition testimony, or they purport to summarize statements in documents not attached to affidavits.  Plaintiffs oppose the motion to strike in its entirety.

The Court begins with the basic principle that to either support or refute a motion for summary judgment under Rule 56, a party may submit evidence in a form that would be inadmissible at trial (such as an affidavit) provided that the content or substance of the evidence is admissible. *Hardy v. S.F. Phosphates Ltd.*, 185 F.3d 1076, 1082 n.5 (10th Cir. 1999).  Indeed, in response to a defendant's summary judgment motion, it is Plaintiffs' burden to "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for" them. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)

---

[1]Although the Plaintiffs attached the exhibits at issue to their response to Chatterjee's motions for summary judgment, it appears that all the Defendants have an interest in striking the exhibits because the Plaintiffs have used those exhibits to support their responses to the other Defendants' motions for summary judgment.

(quoting Rule 56(e)).  Furthermore, it is Plaintiffs' burden to demonstrate that their evidence is admissible under Rule 56(e).  *See id*. at 671, 672.

A.    **Transcripts and Notes of Unsworn Interviews Conducted During the Administrative Investigation of Plaintiffs' Whistleblower Claims (Plaintiffs' Exs. C, D, E, F, I, J, L, and M)**

These exhibits consist of either transcripts of interviews of LANL employees conducted during the administrative investigation of Plaintiffs' whistleblower claims, or notes taken regarding the content of such interviews.  From what the Court can gather, at the time of the statements none of the interviewees was under oath or testifying under penalty of perjury, nor are any of the interviewees parties to this lawsuit.  Defendants contend that the interviewees had no opportunity to review and verify the notes and transcripts of their interviews, an argument that Plaintiffs do not dispute.  The Court concludes that these exhibits are all inadmissible hearsay, and will strike them for that reason.  These interviews do not meet the requirements of Rules 801(d)(1) or 804(b)(1) of the Federal Rules of Evidence, as they were not made under oath, the declarants were not subject to cross examination, and Plaintiffs have made no showing of the declarant's unavailability.

Plaintiffs offer several arguments in favor of admitting this testimony, all of them futile.  They contend that these exhibits are admissible because Defendants offered the transcripts of interviews given by Plaintiffs in the administrative investigation in support of Defendant Reed's motion for summary judgment.  *See* Exs. B and D to Doc. No. 99.  However, in that context the Plaintiffs' own statements are not hearsay, but rather admissions by parties opponent, offered against those parties, under Fed. R. Evid. 801(d)(2).  In contrast, as explained further below, the exhibits Plaintiffs offer here against Chatterjee are not statements by a party opponent.

Next, Plaintiffs contend that the witness statements in Exhibits C, D, E, F, I, J, L, and M are

admissions by parties opponent, but none of those witnesses (Cindy Dworzak, Mary Erwin, Tim Harmeson, Jim Herring, Dennis Martinez, Jessica Martinez, Dan Romero, and Elliot Stenzel) is a party to this proceeding.   Therefore, in order for these interview transcripts and notes to constitute non-hearsay party admissions under Rule 801(d)(2), the defendant against whom they are offered—in this case, Chatterjee—must have manifested an adoption or belief in the truth of the statements (Rule 801(d)(2)(B)), or authorized the statements (Rule 801(d)(2)(C)).   Alternatively, the declarants would have to be agents of Chatterjee concerning a matter within the scope of their employment, and the statements must have been made during the existence of the employment relationship.   Rule 801(d)(2)(D).   Plaintiffs make no showing that any of these conditions are satisfied.   Certainly, Plaintiffs have not shown that any of the individuals interviewed in this group of exhibits was an employee or agent of Defendant Chatterjee, the defendant against whom they offer the evidence.   At most, the evidence offered by Plaintiffs shows that they were Chatterjee's co-workers, not her employees or agents.   The mere fact that these individuals may have been Chatterjee's subordinates or colleagues is not enough to make them her agents, absent evidence that they were directly supervised or otherwise directly controlled by her.   *See United States v. Agne*, 214 F.3d 47, 54-55 (1st Cir. 2000) (statements of corporate employee may be admitted against corporate officer only under certain circumstances giving rise to agency relationship).   Accordingly, their statements are not admissible as Chatterjee's own admissions pursuant to Rule 801(d)(2).[2]   Furthermore, in order to qualify as an admission by a party opponent, an agent's statement must be made during the course of the agency relationship.   *Id*.   According to Exhibit D, Mary Erwin was no longer an employee of

---

[2] Indeed, the out-of-court statements of any individual, including those of co-defendants described in other exhibits and affidavits, are not admissible against Chatterjee under Rule 801(d)(2).   *See Stalbosky v. Belew*, 205 F.3d 890, 894 (6th Cir. 2000).

5

LANL at the time of her interview.  From the context of Exhibit L, nor was Elliot Stenzel a LANL employee at the time of his interview.  It appears from Exhibit L that Dan Romero is an employee of the Department of Energy ("DOE"); there is no indication that he is or ever was employed by LANL.  For these additional reasons, these three witnesses were not the agents of any defendant at they time they gave their statements, which therefore do not satisfy Rule 801(d)(2).

Next, Plaintiffs suggest that Defendants, who successfully moved for a stay of discovery pending decision on their motions for summary judgment on qualified immunity, should not be permitted to oppose consideration of the interviews, especially because the stay prevents Plaintiffs from deposing the witnesses.  That argument fails to persuade the Court because Fed. R. Civ. P. 56(f) provides the Plaintiffs with a remedy in the event that they felt they needed additional discovery in order to properly oppose the Defendants' motions for summary judgment.  The Plaintiffs did not pursue relief under Rule 56(f).

Plaintiffs also contend that the interview transcripts and notes are subject to the hearsay exception for business records under Fed. R. Evid. 803(6), as well as that for public records under Fed. R. Evid. 803(8)(C).  Rule 803(6) provides an exception to the hearsay rule for business records if they are "kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation . . ." "The rationale behind the business records exception is that such documents have a high degree of reliability because businesses have incentives to keep accurate records." *Timberlake Const. Co. v. U.S. Fidelity & Guar. Co.*, 71 F.3d 335, 341 (10th Cir. 1995).  To satisfy Rule 803(6), "a document must (1) have been prepared in the normal course of business; (2) have been made at or near the time of the events it records; ... (3) be based on the personal knowledge of the entrant or of an informant

who had a business duty to transmit the information to the entrant;" and (4) not have involved

sources, methods, or circumstances indicating a lack of trustworthiness. *Hertz v. Luzenac America,*

*Inc.*, 370 F.3d 1014, 1017 (10th Cir. 2004) (quotation omitted).  Plaintiffs make no attempt to meet

their burden to show that the exhibits meet each of these requirements; instead, Plaintiffs simply

declare the interview notes and transcripts to be business records.  Similarly, Plaintiffs make no effort

to show that the interview notes and transcripts satisfy Rule 803(8)(C), which by its express terms

applies only to those factual *findings* resulting from a government investigation, and not to the

investigation as a whole.[3]  There are three requirements for a document to be admissible under Rule

803(8)(C): (1) the report was prepared "pursuant to authority granted by law"; (2) the evidence

constitutes "factual findings"; and (3) circumstances do not indicate the report is untrustworthy.

*Perrin v. Anderson*, 784 F.2d 1040, 1046-47 (10th Cir. 1986).  The term "factual findings" includes

"conclusions and opinions found in evaluative reports of public agencies."  *Id*. at 1047.  DOE's

investigator may have gathered the interview notes and transcripts as evidence in its administrative

investigation of Plaintiffs' whistleblower claims, but they are not factual findings, and therefore cannot

be admitted under Rule 803(8)(C).

Finally, the Plaintiffs argue that the uncontested authenticity of the transcripts and notes, along

with the circumstantial guarantees of trustworthiness, qualify them for the residual hearsay exception

---

[3] Rule 803(8) provides: "Public records and reports.  Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

in Fed. R. Evid. 807. Rule 807 provides that a statement with guarantees of trustworthiness may be admitted if: (1) it is evidence of a material fact; (2) is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (3) admission of the statement would serve the purposes of the rules and interests of justice.  Fed. R. Evid. 807.  The Tenth Circuit has previously noted that "an expansive interpretation of the residual exception would threaten to swallow the entirety of the hearsay rule." *United States v. Tome*, 61 F.3d 1446, 1452 (10th Cir. 1995).  Accordingly, the rule should only be applied "in extraordinary circumstances where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice."  *Id*. The Court concludes that the unreviewed, unsworn interview transcripts and notes offered by Plaintiffs in this case do not meet this criteria, and therefore they are inadmissible.

### B.   Interview Transcript (Ex. A) and Deposition (Ex. B) of Bani Chatterjee

Chatterjee's unsworn interview statements are not hearsay, as they are admissions by a party opponent, offered against that party, under Fed. R. Evid. 801(d)(2).  That aspect of the Defendants' motion to strike will be denied.  However, Chatterjee's statements during her unsworn interview are hearsay to the extent they are offered against any of her individual co-defendants.  Further, the Court agrees with Chatterjee that some portions of her deposition testimony should not be considered because they are irrelevant to the Plaintiffs' retaliation claims against her.  These include her testimony regarding her educational background (pp. 35-36, 42-45, 279) and her transfer to another position after an alleged duplicate payment (pp. 271-275).  Also irrelevant to their retaliation claims against Chatterjee are the highlighted portions of pages 286, 294-296, 316-317, and 326 of Chatterjee's deposition.

### C.      Affidavit of Glen Walp (Ex. O)

The Court will exclude this Exhibit on the grounds that it is totally irrelevant to the claims in this case.  Walp recounts events surrounding his own allegations of mismanagement at LANL as well as the alleged retaliation against him as a result of his whistleblowing activities.  However, the affidavit makes no mention of either of the Plaintiffs, or of any of the Defendants.  Walp's affidavit offers no evidence that can shed light on any of the Plaintiffs' claims against the Defendants in this case, and Plaintiffs make no showing that the evidence is admissible for any of the purposes set forth in Fed. R. Evid. 404(b).  Thus, it is irrelevant and will be excluded on that grounds.   Further, the exhibit is rife with inadmissible hearsay, as Walp recounts the statements of non-parties, the content of newspaper articles, the content of unattached DOE reports, and his own statements at a Congressional hearing.  Accordingly, the Court will grant the motion to strike this document.

### D.      Depositions of Bill Wadt (Ex. N) and James Johnson (Ex. H)

Neither of these depositions contains testimony relevant to Plaintiffs' retaliation claims against Chatterjee, and therefore the Court will not consider them.  The Court makes no determination at this time as to whether the evidence cited by Plaintiffs in these deposition excerpts is admissible against any of the other Defendants.

### E.      Affidavits of Hook (Ex. G) and Montano (Ex. K)

The analysis of Defendants' objections to Hook and Montano's affidavits is complex because both affidavits are quite lengthy.  (Hook's affidavit is 35 pages long, and Montano's is 27 pages.)  Both affidavits contain a significant amount of inadmissible testimony, including hearsay as well as

unsupported conclusions[4], speculation[5] about the thoughts and motives of others, irrelevant facts, and opinions.  Furthermore, some of the testimony constitutes Plaintiffs' recounting of statements by various defendants that would be inadmissible hearsay when offered as evidence against their co-defendants, but which might be admissible as an admission by party opponent when offered against the defendant who was speaking.  In addition, the affidavits often mingle inadmissible statements with admissible testimony within the same extended paragraphs, and sometimes within the same sentence. Their tone is argumentative, resembling a brief rather than a neutral recitation of facts ordinarily provided in an affidavit.  The nature of the Hook and Montano affidavits is particularly alarming in light of the fact that counsel for the Plaintiffs admits to preparing the affidavits on their clients' behalf. *See* Bernabei Aff., attached as Ex. 1 to Doc. No. 161, at ¶ 2.   On the other hand, some of the statements offered by Plaintiffs in their affidavits that would otherwise be hearsay are admissible, because they are relevant not for the truth of their contents, but rather for the fact that they were said.

In the interest of brevity, the Court will not engage in a sentence by sentence analysis of the challenged affidavits based on hearsay, speculation, relevance, and improper argument, as that analysis could ultimately be longer than the affidavits themselves.  Instead, the Court advises the

---

[4] Examples of such conclusory statements are Plaintiffs' statements that they were far more qualified than other individuals selected for certain positions.  *See* Hook Aff. at ¶ 23; Montano Aff. at ¶ 60.  Neither affiant provides a factual foundation for these conclusions, or any basis to believe that they have personal knowledge to support their conclusory statements.

[5] Plaintiffs demonstrate a fundamental misunderstanding of the concept of personal knowledge.  They argue that they have personal knowledge regarding the reasons LANL terminated the employment of Katherine Brittin and Joe Salgado because those events were the subject of national media coverage, Congressional hearings, and DOE investigations, and therefore the Plaintiffs, along with any other LANL employees, have personal knowledge of those events.  However, office gossip and media reports cannot form the basis for personal knowledge, which must be based upon first-hand knowledge of events.

parties that the portions of the affidavits that are not admissible or, if admissible, are not relevant to

a particular defendant's motion for summary judgment, have been ignored. The parties will be able

to determine what portions, if any, of the Plaintiffs' affidavits have been considered by the Court by

reviewing the section of either this or any future opinion dealing with the merits of a motion for

summary judgment.

Defendants also argue that portions of Plaintiffs' affidavits should be stricken on the grounds

that they contradict Plaintiffs' prior deposition testimony in an attempt to create a sham issue of fact.

The Court will deny the motion as to Hook.  In his deposition, when asked why he believed

Chatterjee did not give him a second interview for a job, Hook stated, "She *initially* told me I wasn't

qualified."  Hook Depo. at p. 57 (emphasis added).  There were no follow-up questions in the

deposition regarding what subsequent reasons Chatterjee may have given Hook regarding her failure

to hire him.  Therefore, the Court concludes that Paragraph 24 of Hook's affidavit, which addresses

that topic in greater detail and sets forth subsequent statements allegedly made by Chatterjee, is not

in direct conflict with his prior deposition testimony.  Any overlap with regard to what Hook

originally testified about Yvonne Deshayes said may be brought out on cross examination to show

the inconsistencies of Hook's memory on this topic.  However, the Court will not strike Hook's

affidavit at this time.

With regard to Montano's affidavit, Defendants contend that Paragraphs 24-27 and 29-30

contradict his prior deposition testimony, in which he was asked what Chatterjee did to retaliate

against him.  At his deposition, Montano said that Chatterjee limited his pay raises to the bare

minimum, Montano Depo. at p. 39, that she interfered with his advancement opportunities

(unspecified), *id*., and that she repeatedly asked him to explain accounting concepts to her, *id*. at p.

40. Defense counsel did not follow up on any of the items listed by Montano or ask for additional details. When asked to enumerate other retaliatory actions by Chatterjee, Montano replied, "I'm sure there are others, but that's all I can think of right now." *Id*. at p. 41. Then, in his affidavit, Montano sets forth additional details about his claims against Chatterjee. Montano avers that Chatterjee discouraged him from applying for a team leader position that he was already performing in an "acting" capacity, Montano Aff. at ¶ 25, that her first choice for the job was someone else, *id*., that Chatterjee kept asking him if he still wanted the job and told him that it was not a promotion, had long hours, and carried no pay raise. *Id*. He also adds in his affidavit that after she gave him the team leader job, Chatterjee constantly challenged his understanding of team responsibilities, requested that he work extra hours, made an unnecessary number of email requests for status updates, and treated him in such a hostile manner in front of his staff that one of them cried. *Id*. at ¶ 26. Finally, he claims that Chatterjee prepared a performance evaluation of him containing false criticisms of his work, and as a result he received only the standard annual pay raise. *Id*. at ¶ 30. Defendants argue that Montano added these additional details in the affidavit in order to create a sham issue of fact. The Court concludes that Montano's affidavit does not contradict his deposition testimony, but rather adds additional details relating to the general matters listed by Montano at the deposition—matters that defense counsel failed to follow up on when questioning Montano. For example, at his deposition Montano said that Chatterjee limited his pay raises, and in his affidavit he discusses the performance evaluation she prepared which had the effect of limiting his pay raise. Other details in the affidavit, such as her challenging his understanding of team responsibilities and asking for status updates, are merely an expansion of his deposition testimony that Chatterjee "harassed [him] continuously." Montano's allegation that Chatterjee told him to stop airing LANL's "dirty laundry"

12

may be evidence of retaliatory *motive*, but in and of itself that alleged statement is not an act of retaliation.  At the deposition Defense counsel only asked Montano to list Chatterjee's retaliatory acts, and therefore it is not surprising that he did not reveal that statement in response to the questions he was asked.  Similarly, the Court finds that Montano's affidavit regarding Defendants Patrick Reed and Richard Marquez does not contradict his prior deposition testimony.  Thus, the Court will deny Defendants' motion to strike Montano's affidavit as a sham.

Finally, Defendants move to strike references in Plaintiffs' affidavits to the contents of documents that Plaintiffs failed to attached to those affidavits.  Instead, Plaintiffs have attached those documents to subsequent affidavits and prepared a chart that purports to direct where documents referenced in one affidavit were attached in a subsequently filed affidavit supporting a different motion.  The result is a confusing jumble.  In order to find a document referenced in one of Plaintiff's affidavits, the Court must consult this chart, which then points to yet a third location for the document.  The Court concludes that this is an inappropriate method to authenticate documents and results in abuse of the Court's time and resources.  This aspect of the motion to strike will be granted.  However, to the extent Plaintiffs' affidavit testimony is still admissible without the documents that should have been attached, that testimony will not be stricken.

## II.    MOTIONS FOR SUMMARY JUDGMENT

### A.    <u>Legal Standard</u>

Summary judgment generally is appropriate when a court determines that "'there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law.'"  *Thrasher v. B & B Chem. Co.*, 2 F.3d 995, 996 (10th Cir. 1993) (citation omitted).  Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

To carry its initial burden, the moving party need not negate the nonmoving party's claim. *See Allen v. Muskogee, Okl.*, 119 F.3d 837, 840 (10th Cir. 1997), *cert. denied sub nom. Smith v. Allen*, 522 U.S. 1148 (1998). "'Instead, the movant only bears the initial burden of 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). A plaintiff cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment but rather must produce some specific factual support of its claim. *See Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988); *Fritzcshe v. Albuquerque Mun. Sch. Dist.*, 194 F. Supp. 2d 1194, 1206 (D.N.M. 2002). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Upon a motion for summary judgment, a court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law.

14

*See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

The standard for analyzing a motion for summary judgment shifts slightly if, as here, a defendant raises qualified immunity as a defense in a lawsuit brought under 42 U.S.C. § 1983. Qualified immunity bars Section 1983 suits against defendants in their individual—but not official—capacities. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 167 (1985) (citations omitted). The qualified immunity defense was created to shield public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). It provides immunity from suit and not merely from liability. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). It therefore spares defendants the burden of going forward with trial. *See Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995), *abrogated on other grounds*, *Saucier v. Katz*, 533 U.S. 194 (2001).

Once a moving party raises the defense of qualified immunity, the nonmoving party must (1) assert facts which, if true, would constitute a violation of a constitutional right, and (2) demonstrate that the "right was clearly established at the time such that a reasonable person in the [movant's] position would have known that [the] conduct violated the right." *Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996) (citations omitted); *see also, e.g.*, *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). The first part of this inquiry requires a court to determine whether the parties' submissions, viewed in the light most favorable to the plaintiff, could show the officers' conduct violated a constitutional right. *Cf. id.* at 201. The second part of the inquiry requires a court to "assess[] the objective legal reasonableness of the action at the time of the alleged violation and ask[] whether 'the right was sufficiently clear that a reasonable officer would understand that what he [or she was] doing violates that right.'" *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (quotation

15

omitted); *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citations omitted).

If a nonmoving party fails to satisfy its two-part burden, a court must grant the moving party qualified immunity.  *See Medina*, 252 F.3d at 1128.  If, and only if, the plaintiff establishes both elements of the qualified immunity test does a defendant then bear the traditional burden of showing "'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'"  *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995)).  In other words, although the court "review[s] the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity."  *Medina*, 252 F.3d at 1128 (citation omitted).  However, if the nonmoving party successfully demonstrates the violation of a clearly established right, the moving party assumes the normal summary judgment burden of demonstrating that no genuine issue of material fact exists that would defeat its claim for qualified immunity.  *See Woodward v. City of Worland*, 977 F.2d 1392, 1396-97 (10th Cir. 1992) (citations omitted).

> **B.**    **Facts**

The facts, based upon admissible evidence provided by the parties and viewed in the light most favorable to the Plaintiffs, are as follows.

> **1.**    **Tommy Ray Hook**

In 1989, LANL hired Hook as a Senior Administrative Specialist.  Hook then held a variety of positions, including that of "whistleblower officer."  In 1994, Hook became the Senior Advisor for Audits as well as the acting Internal Audit Manager.  In 1996, Hook accepted a position as Program Manager for Internal Controls and was no longer a whistleblower officer or the Internal

Evaluations Office Leader. From 1996 until 2003, Hook's status was "unassigned," and he occupied a series of temporary duties.  In the 1996-2001 time period, Hook applied for numerous management and leadership positions at LANL, but he was not hired for any of these positions.

In 1997, Hook testified in a class action lawsuit challenging a reduction in force at LANL. Hook testified that his former supervisor, Katherine Brittin, had pressured him to conceal financial irregularities and unallowable costs from the DOE, and that Brittin had threatened him and his staff with loss of raises, promotions, and jobs if Hook insisted on an aggressive audit approach or on issuing accurate audit reports that might cause embarrassment to the University.[6]  A short time later, Hook repeated that testimony at a public court hearing in the case.

Hook met Chatterjee in early 2002.  He told her about the problems he had encountered with Brittin, including that Brittin had threatened him in an attempt to persuade him to change his audit reports.[7]  In August of 2002, Hook applied to be the Project Leader for Accounting Controls, an SSM-3 position, which was one grade lower than the SSM-4 position Hook held at the time.  Under the selection process, a screening committee conducted initial interviews and recommended the top candidates to Chatterjee, who was the hiring manager, for additional interviews.  The screening committee, which included Montano, interviewed Hook and five other candidates for the position. Montano believed Hook to be very qualified for the position and urged the committee to interview him.  The committee did so, but the other members showed more interest in Carol Salazar and Rocke Johnson, whom they identified as friends of Chatterjee.  Ultimately, the committee did not

---

[6]These statements are not hearsay in this context because they are relevant to and offered for the fact that they were said by Hook as an alleged basis for retaliation against him, and are not offered for their truth.

[7]*See* footnote 4, supra.

recommend Hook for a second interview with Chatterjee, but instead suggested Carol Salazar, Rocke Johnson, and Michael Granito for further consideration.   Chatterjee interviewed these three candidates identified by the committee and selected Rocke Johnson for the position.  In a written memorandum justifying her selection of Rocke Johnson for the position, Chatterjee wrote, "[Hook] has had a very impressive career internally as well as external to the Lab.  [Hook] is not a CPA, however his combination of education and experience could compensate for the lack of certification. The candidate for this position would require strong inter-personal and communication skills and [Hook] was not as competitive in this area as the lead candidates."

After Chatterjee chose Johnson for the position, Hook asked Chatterjee why she did not choose him, and she told him it was because he was not qualified (a fact disputed by Chatterjee).  She said that she did not see him as a team player.  Hook brought up the matter again in a later conversation.  This time, Chatterjee told him he was not qualified for the position, then said that he was overqualified and that she did not think he would have wanted the paycut associated with taking a job at a lower pay grade.   In late 2003, Hook started a new position focused on internal controls known as Self Assessment and Procurement Review Team ("SAPR Team").

### 2.    Charles Montano

Montano began working at LANL in 1978.  In 1987, the University's Office of the President hired him as Senior Auditor in the Internal Audit Group, which was then operated directly by the University.  In 1991, the University promoted Montano to Principal Auditor.  In the 1990's, Montano made disclosures to DOE officials and to the New Mexico congressional delegation regarding alleged

illegal billing of costs by the University to DOE and questionable accounting practices at LANL.[8]

He also raised complaints about LANL's alleged bias against women and minorities in hiring, compensation, and promotion. Montano organized a group called "Citizens for LANL Employee Rights" in response to a LANL reduction in force in 1995. In 1996, Montano filed a whistleblower complaint with DOE alleging that LANL had retaliated against him for his disclosure of financial improprieties to DOE and members of Congress. In 1999, Montano and LANL settled his whistleblower complaint.

In early 2002, Hook told Chatterjee about the roles he and Montano had in reporting Brittin's alleged misconduct. In February of 2002, Montano became acting Team Leader of the General Accounting and Work for Others Team within LANL's BUS-1 group, while the permanent team leader was on assignment to another project. Montano's team, mostly accountants, was responsible for the monthly and yearly closing process, reconciliation for all bank accounts, maintaining the general ledger using data from systems throughout LANL, and various other accounting and reporting activities. Then, the BUS-1 Group Leader (a position presumably above the Team Leader) resigned and LANL advertised the position. Montano competed for the position, but in April of 2002 Chatterjee was chosen. Shortly after she became the Group Leader, Chatterjee opened up for competition the Team Leader position then occupied by Montano in an "acting" capacity. Again, Montano applied for the job. Chatterjee asked Montano if he still wanted the Team Leader position and told him that it was not a promotion, had long hours, and would carry no pay raise. Montano inferred from Chatterjee's statements that she did not want him to apply for the job, but he did so

---

[8] Again, these out of court statements are offered not for their truth, but merely for the fact that Montano made them.

anyway.  A screening committee (which included Chatterjee and three others) interviewed the candidates and ranked Anita Stone first and Montano second.  Chatterjee told Montano that "it was a close call" and "another person was equally qualified."  However, on July 19, 2002, Chatterjee ultimately offered Montano the position at the direction of Defendant Richard Marquez ("Marquez").[9]  After Montano took the job, Chatterjee challenged Montano's understanding of team responsibilities, often requested that he work extra hours, and made frequent requests for status updates and process details.[10]  She also told Montano that "we don't keep airing our dirty laundry for the world to see."   Montano also claims that Chatterjee created a hostile work environment for

---

[9] Although neither side in this lawsuit has explained the managerial hierarchy at LANL among the relevant actors in this case, the Court has inferred that Marquez occupied a management position at LANL above that of Chatterjee and Plaintiffs.  Although Montano contends in his affidavit that "the Lab's Legal office," and not Marquez, intervened to ensure that Montano was hired as team leader, his statement is based on inadmissible hearsay.

[10] The Court must again point out the inaccuracies and use of speculation and hearsay by Montano in his affidavit.   In Paragraph 26, Montano says that at one point, Chatterjee treated him in such a hostile manner in front of his staff that one of them, Jessica Martinez, burst into tears.  Therefore, in his affidavit Montano purports to have personal knowledge of the state of mind of Jessica Martinez, when in fact that is mere speculation.  Martinez's interview transcript (attached as Ex. J to Doc. No. 138, and which the Court has ruled to be inadmissible hearsay) suggests the inaccuracy of Montano's speculation about Martinez's state of mind, since Martinez explained that she cried at the meeting due to the long hours she had put in, the pressure of work, the departure of colleagues from the team, the pressure of being awarded a project leader position and feeling bad that her co-worker did not receive the position, and feeling that it was not fair for Chatterjee to expect Montano to do the month-end closing.  Although the Court will disregard the Martinez interview because it is inadmissible, Montano's mischaracterization of its contents has not escaped the Court's notice.  In paragraph 27 of his affidavit, Montano again purports to set forth what knowledge Chatterjee had about his prior complaints against LANL and Brittin, and he purports to know that she learned of those things at meetings between Chatterjee and Mary Erwin which it appears Montano did not attend.  He provides no foundation for personal knowledge of these alleged conversations, yet blatantly purports to testify in his affidavit as to what Chatterjee knew.  Montano also asserts that Chatterjee knew about his public advocacy for salary parity at LANL, without providing any foundation for such assertion. This is inadmissible speculation.

him.  When asked to explain that allegation, Montano testified that she repeatedly asked him to explain certain accounting concepts to her, which he found frustrating, and he did not know if Chatterjee was doing it because she really did not understand or if she was just trying to annoy him.

As BUS-1 Group Leader, Chatterjee was Montano's direct supervisor from April 2002 to March 2003.  On approximately October 2, 2002, Chatterjee issued Montano a written performance evaluation for the period August 1, 2001 to July 31, 2002, which included input from Montano's former supervisor, Mary Erwin.[11]  Chatterjee's evaluation said that Montano needed to get more involved with the team members and learn the intricacies of their jobs so that he could be a better source of guidance for them; on the other hand, Montano claims to have been a very hands-on manager.  Chatterjee gave Montano a "performance score" of 3.0 out of 5.0, a "job content score" of 3.5 out of 5.0, and an "ORC score" of 6.5, as well as a standard $2,250 raise.[12]  Although the record contains no explanation of the ORC score, Chatterjee testified that receiving a score of 6.0 indicates that one is a "solid performer."  The other team leaders in the group were all rated one point higher than Montano on that scale.  On the other hand, in his evaluation for the prior year, Mary Erwin gave Montano an ORC score of 6.0, or half a point lower than the score given to him by Chatterjee, along with a $2,200 raise.

---

[11] Montano disputes this, citing to the summary of Erwin's unsworn interview, which he attached as Ex. D to Doc. No. 138.  However, as explained above that document in inadmissible hearsay.  Further, even if it were admissible, its contents do not support Montano's position, which he must support with more than mere "information and belief," which he does in response to this fact set forth by Chatterjee.

[12] Montano argues that despite this raise, his salary was still well below average given his qualifications and experience.  Montano does not say what the average pay was (or provide a basis for personal knowledge of such information), and he relies on a reference in his affidavit to the contents of a pay equity study which is inadmissible hearsay.

In mid-2002, Chatterjee told Hook that she was upset with Montano because he was frequently mentioned in the press and because he was very public about his advocacy, and that her inability to control Montano was making her look bad.  In early 2003, Montano and Chatterjee had a conversation in which Montano told Chatterjee, "you never wanted me here," to which she responded, "you don't want to stay here."  When Montano indicated to her that he would leave his position, Chatterjee looked pleased and said that she would not be an obstacle to his job search.

In 2003, Hook approached Montano about applying for a position on the SAPR Team. Chatterjee encouraged Hook to hire Montano and called him several times between January and March of that year.  She asked Hook to "please take Chuck Montano for the SAPR Team" and said "I have to get him out of here" because "he did a lot of public stuff."  Hook ultimately hired Montano because of his qualifications and expertise, despite the fact that Chatterjee created the impression that she was desperate to get rid of him.  In March of that year, Montano resigned as Team Leader in BUS-1 and joined Hook's staff.  Thereafter, Montano was no longer in Chatterjee's group, though his workspace remained near her area.  In approximately August of 2004, LANL underwent a security stand-down.  At that time, Chatterjee directed LANL computer technicians to disconnect Montano's computer from a color printer located near her office.  Chatterjee told Montano that she had done it for security reasons, which he thought implied that she thought he presented a security risk, and which he interpreted as retaliation against him.

### C.    Legal Analysis

As explained above, in order to evaluate Chatterjee's qualified immunity claim, first the Court must determine whether she violated Plaintiffs' constitutional rights, and only then must it consider whether such violation was prohibited by clearly established law.

22

In order to prevail on their First Amendment retaliation claims, Plaintiff must come forward with evidence to show that they engaged in constitutionally protected speech which was a substantial or motivating factor in an adverse employment action taken against them. *See Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996). The Tenth Circuit has applied a four-part test to determine whether a government employer violated a public employee's First Amendment rights by retaliating against him for protected speech. *Jantzen v. Hawkins*, 188 F.3d 1247, 1257 (10th Cir. 1999). First, the court must determine whether the employee was speaking as a citizen upon a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 146 (1983). In evaluating whether particular speech meets this test, the court must consider "the content, form and context of a given statement." *Id*. at 147-48. Speech involves a matter of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community. *Witham v. Baptist Health Care of Oklahoma, Inc.*, 98 F.3d 581, 583 (10th Cir. 1996) (quoting *Connick*, 461 U.S. at 146). Speech pertaining to internal personnel disputes and working conditions, however, ordinarily does not involve public concern. *Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir. 1996). A public employee's First Amendment rights are not implicated when the public employee speaks not as a citizen on a matter of public concern, but instead as an employee upon matters of only personal interest. *Connick*, 461 U.S. at 147. As the Supreme Court explained, "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick*, 461 U.S. at 146.

The Supreme Court recently clarified this first element of a First Amendment retaliation claim, emphasizing that courts should initially focus on the question of whether a public employee was

speaking as a *citizen* on a matter of public concern. *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1960 (2006). In *Garcetti*, a deputy district attorney, after examining an affidavit supporting a search warrant, wrote a memorandum to his superiors stating his concerns that the affidavit contained serious misrepresentations and recommending dismissal of the case. *Id.* at 1955-56. Despite the plaintiff's concerns, his superiors decided to proceed with prosecution. *Id.* at 1956. The trial court held a hearing on a defense motion concerning the legality of the warrant, and the plaintiff testified about his observations of the affidavit. *Id.* The trial court rejected the defense challenge to the warrant. *Id.* The plaintiff claimed that in the aftermath of these events he was subject to adverse employment actions, and he ultimately filed a 42 U.S.C. § 1983 claim based on violations of his First and Fourteenth Amendment rights. *Id.*

The Supreme Court concluded that the plaintiff's First Amendment rights were not violated because he was not speaking as a citizen on a matter of public concern. *See id.* at 1960. In so holding, the Court explained that when a citizen enters government service, he must accept certain limitations on his freedom in order for the government to provide efficient public services. *Id.* at 1958. The Court noted that "while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Id.* at 1959 (quoting *Connick*, 461 U.S. at 154). The Court nevertheless recognized that a citizen is still a citizen, and that employees speaking as citizens about matters of public concern must face only those speech restrictions necessary for the employers to operate efficiently and effectively. *Id.* at 1958.

In applying these principles to the case at hand, the Supreme Court concluded that the First Amendment did not protect the plaintiff's speech because "his expressions were made pursuant to his duties as a calendar deputy." *Id.* at 1959-60. The Court determined that the fact that the plaintiff

spoke as a prosecutor fulfilling his responsibility to advise his superiors about how best to proceed with a case was the dispositive factor. *Id.* at 1960. The Supreme Court therefore held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.*

The second element of a First Amendment retaliation claim is a balancing test. If the court finds that the plaintiff has spoken as a citizen on a matter of public concern, then the court must balance the interests of the employee, as a citizen, in expression upon matters of public concern and the government's interest "in promoting the efficiency of the public services it performs through its employees so that it can carry on an efficient and effective workplace." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). A plaintiff's speech is protected by the First Amendment only if his interest outweighs the government's interest. *Dill v. City of Edmond*, 155 F.3d 1193, 1201 (10th Cir. 1998).

Third, if the first two requirements are met, the plaintiff must then show that the speech was a substantial or motivating factor in the challenged government action. *See Jantzen*, 188 F.3d at 1257. Finally, if the plaintiff meets the first three requirements, the government must demonstrate that it would have reached the same decision regardless of the protected speech. *Id.* The first two steps are legal questions to be resolved by the court, while the latter two steps involve questions of fact to be resolved by the jury. *Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996). However, as with all questions of fact, the plaintiff has the burden to come forward with sufficient evidence in support of his claim to demonstrate a genuine issue of material fact for resolution by the jury.

       **1.**     **Tommy Ray Hook**

Hook contends that Chatterjee took one adverse action against him by failing to hire him in 2002.[13] In his deposition, Hook initially contended that Chatterjee did not hire him as Project Leader for Accounting Controls in retaliation against him for speaking out about his experiences with Katherine Brittin from 1994-1996 and his subsequent testimony on that subject in 1997. Now, in his response to Chatterjee's motion for summary judgment, Hook retracts that position. Hook currently contends that Chatterjee retaliated against him for "disclosures to DOE, the U.S. Congress, and the New Mexico legislature, and the press on matters of substantial national and regulatory concern." Doc. No. 138 at p. 34. However, the paragraphs of the Hook and Montano affidavits cited to support that claim all refer to events that took place in the later part of 2003, more than a year after Chatterjee failed to hire Hook as Project Leader for Accounting Controls.

The Court concludes that under either theory, Chatterjee is entitled to summary judgment on Hook's First Amendment retaliation claim against her because he has failed to come forward with evidence to create a genuine issue of material fact on causation, the third prong under *Jantzen*. Hook has articulated only one specific adverse employment decision against him carried out by Chatterjee: her failure to hire him as Project Leader for Accounting Controls in the summer of 2002. Chatterjee's decision simply could not have been motivated by Hook's actions on the SAPR Team in 2003, as Hook now argues, because she declined to hire him *before* he took those actions. Even if the Court considers Hook's original argument, now abandoned, that Chatterjee retaliated against him for his activities in the mid-1990's, Hook has failed to submit evidence from which a jury could reasonably infer that Chatterjee's decision not to hire him was motivated by his decision to speak publicly about

---

[13] There is no dispute that a failure to hire is an actionable adverse action for First Amendment retaliation purposes.

Katherine Brittin. The undisputed evidence shows that it was the interview committee, composed of Montano and others, who decided who Chatterjee should interview for the job, not Chatterjee. Montano and Hook assume that Chatterjee manipulated the process and "pre-selected" the candidates, but other than their own unsupported speculation, Plaintiffs present no evidence of such manipulation by Chatterjee, and mere speculation will not avert summary judgment. Further, Montano's testimony suggests that the committee's decision was made based upon social favoritism and friendships, not retaliation against Hook. Finally, the reason given for not hiring Montano—that he was not as competitive in inter-personal and communication skills as the lead candidates—as well as her seemingly inconsistent reasons given for her decision in a later conversation, simply are not enough to raise an inference of retaliation based upon the fact that he had told her about his troubles with Ms. Brittin, particularly when she did not participate in the committee interview of Hook and therefore would have little knowledge or memory of his participation in the process.

Because the Court finds that Hook has failed to raise a factual issue with regard to causation, it need not determine whether Hook was speaking as a citizen on a matter of public concern, nor must it balance Hook's and the government's respective interests. Chatterjee's motion for summary judgment on Hook's First Amendment claim will be granted.

## 2.    Charles Montano

The first question before the Court is whether Chatterjee subjected Montano to an employment action that is actionable under the First Amendment. The Supreme Court has held that a plaintiff need not prove termination in order to successfully assert a claim for First Amendment retaliation; rather denial of promotions, transfers and other employment opportunities may give rise to First Amendment claims. *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 72-73 (1990); *see*

*also Wren v. Spurlock*, 798 F.2d 1313, 1318 (10th Cir. 1986) (public school teacher who was harassed, reprimanded and suspended because of her complaints about school conditions could state First Amendment claim); *Schuler v. City of Boulder*, 189 F.3d 1304, 1309-10 (10th Cir. 1999) (written reprimand, removal of important job duties, a low score on a performance evaluation, and involuntarily transfer amounted to sufficiently adverse employment action); *Lybrook v. Members of Farmington Mun. Schs. Bd. of Educ.*, 232 F.3d 1334, 1340 (10th Cir. 2000) (neither the employer's issuance of a "Corrective Action Plan" requiring the plaintiff to "[s]trive to create an atmosphere that will nurture collaboration with all colleagues" and to "conduct affairs with a conscious concern for the highest standards of professional commitment," nor requiring the plaintiff to attend weekly meetings with her supervisor constituted an adverse employment action).

In 2005 the Tenth Circuit observed that Title VII's standard for a retaliatory adverse action is different from that under the First Amendment, and that the First Amendment standard was less stringent.  In *Baca v. Sklar*, 398 F.3d 1210, 1220 (10th Cir. 2005), the Court stated that an employer's actions can satisfy the adverse employment action requirement in the First Amendment context even if the same action is insufficient to satisfy the adverse employment action requirement under Title VII. Similarly, in *Maestas v. Segura*, the Tenth Circuit explained:

> We have repeatedly stated that some forms of retaliation may be actionable under the First Amendment while insufficient to support a discrimination claim under Title VII. In *Schuler v. City of Boulder*, 189 F.3d 1304, 1309 (10th Cir. 1999), we recognized that retaliation involving "promotion, transfer, recall after layoff, and hiring decisions" may be actionable under the First Amendment "although not amounting to termination of employment or the substantial equivalent of dismissal."  That is as far as we have gone. Unlike the Seventh Circuit, we have never held employment action which may tend to chill free speech is necessarily adverse.

*Maestas v. Segura*, 416 F.3d 1182, 1188 n.5 (10th Cir. 2005) (internal citations omitted).  Then, in 2006, the Supreme Court changed the standard to be applied in Title VII retaliation claims.  Under *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405 (2006), to prevail on a Title VII retaliation claim, a plaintiff need only show "that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." ' "  *White*, 126 S.Ct. at 2415 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005)).  Thus, the Supreme Court relaxed the standard that an employee must satisfy in order to show that an employment action was sufficiently adverse to support a Title VII retaliation claim.

The question, then, is whether in the wake of *White*, the standards for evaluating adverse employment actions under both Title VII and First Amendment retaliation claims is now the same in the Tenth Circuit.  The Court has found no Tenth Circuit authority on that issue.  Plaintiffs urge the Court to follow *White* (despite the fact that it was a Title VII case), while Chatterjee contends that the Tenth Circuit's description of the standard in *Maestas v. Segura* remains controlling.  In the absence of post-*White* instruction from the Tenth Circuit on this issue, this Court will continue to look to *Rutan*, *Wren*, *Shuler*, and *Lybrook* for guidance.  The Tenth Circuit has recognized in *Maestas* that Title VII and the First Amendment require different standards for evaluating adverse employment actions in retaliation cases, this Court has no reason to believe that the Tenth Circuit now would abandon that position or the analyses of its prior First Amendment cases.[14]  *White*

---

[14] While the Court is aware that some circuits equate the two standards, *see Zelnick v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006) ("Our standard for First Amendment retaliation claims has always been the equivalent to the standard set forth in *Burlington*

expressly applied to Title VII cases, and this Court will not extend its reach to First Amendment claims as well.

Montano argues that Chatterjee took actionable adverse action against him by attempting to hire someone else for the team leader position he already held in an acting capacity, discouraging him from applying for and accepting the position, repeatedly asking him to explain accounting concepts to her and emailing him with requests for status updates, and giving him an unfair performance evaluation in order to limit his pay raise to the standard amount.  He also contends that after he left Chatterjee's supervision, she retaliated against him by having his computer disconnected from a color printer in her group's work area.  The Court concludes that under *Rutan*, *Wren*, *Shuler*, and *Lybrook*, these are insufficient to amount to an adverse employment action under the First Amendment.  First, it is undisputed that while Montano was not Chatterjee's first choice for the team leader position, she ultimately did hire him for the position.  Whether or not she did so at the urging of Defendant Marquez, and whether or not she pointed out to him the disadvantages of the job he was accepting, does not alter the fact that Montano did ultimately receive the job.  Second, while a supervisor's asking for explanations, even repeated explanations, or asking for frequent status updates may be a management technique that some would find annoying or harassing, it simply does not amount to an adverse employment action, particularly when the record contains only unsupported speculation regarding the motivation behind it.  Third, with regard to the performance evaluation leading to just the standard pay raise, the undisputed evidence in the record is that Chatterjee gave Montano and ORC score of 6.5 which indicates "solid performer."  The written evaluation is generally positive, though Chatterjee does indicate her preference that Montano work on spending more time with his

*Northern*."), it is constrained to follow Tenth Circuit precedent.

team members and becoming a hands-on manager.  Though it may not be the most glowing of evaluations and may not give Montano the praise he feels that he deserves, even viewing it in the light most favorable to Montano the Court cannot say that it amounts to an adverse employment action against him, particularly when Montano did receive a standard raise as a result of the evaluation, and particularly when Montano's own testimony reveals that he felt a less "micromanaging" approach was appropriate for his team.  *See* Montano Depo at pp. 92-95.  The fact that Chatterjee disagreed with Montano's management approach and expressed that disagreement in her performance evaluation of him does not amount to an adverse employment action, even under First Amendment standards. Finally, the Court concludes that Chatterjee's decision to disconnect Montano from a color printer in her area—a decision made during a security lock-down and after he left her organization to work for the SAPR Team—simply is not serious enough to amount to an adverse employment action.

Because the Court concludes that Chatterjee did not subject Montano to an adverse employment action, it need not reach the questions of whether Montano has spoken as a citizen on a matter of public concern, balance the interests of the employee and employer, or determine whether Montano's speech improperly motivated Chatterjee's actions.  Rather, Chatterjee's motion for summary judgment will be granted.

### D.      Exhaustion of Administrative Remedies Under CWPA

 Chatterjee has asserted that she is not named as a respondent in Plaintiff's administrative complaint, a fact that Plaintiffs have not refuted and that is supported by the portion of the charge provided by Defendants.  *See* Ex. C to Doc. No. 92.  Plaintiffs, in turn, argue that Chatterjee is named in the body of the charge, which details her alleged retaliatory conduct against Plaintiffs, and that this constitutes sufficient exhaustion.  However, Plaintiffs have not provided the Court with any evidence

(that is, the portions of the charge which would support their counsel's argument) that they outlined their CWPA claims against Chatterjee in the body of the charge.  Furthermore, both parties have essentially glossed over this issue, and neither party has briefed the question of what is required in order for an employee to exhaust his administrative remedies against an individual supervisor under the CWPA or under California law in general.

The Court has found no authority on this issue that is specific to exhaustion under the CWPA. However, such authority exists relative to California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940 et seq., which prohibits employers from, *inter alia*, discriminating against employees based on race, religion, national origin, physical or mental disability, marital status, sex, or age.  "Under the FEHA, the employee must exhaust the administrative remedy provided by the statute by filing a complaint with the [Department] and must obtain from the Department a notice of right to sue in order to be entitled to file a civil action in court based on violations of the FEHA.  The timely filing of an administrative complaint is a prerequisite to the bringing of a civil action for damages under the FEHA."  *Romano v. Rockwell Internat., Inc.*, 14 Cal. 4th 479, 492, 59 Cal. Rptr. 2d 20, 926 P.2d 1114 (1996) (internal citations omitted).  In *Martin v. Fisher,* 11 Cal. App. 4th 118 (1992), a case brought under FEHA, the individual supervisor was named in the body of the plaintiff's administrative charge, but not in the charge's caption nor in the right-to-sue letter. The appellate court held it was error to dismiss the ensuing claims against the supervisor for failure to exhaust administrative remedies because the supervisor was named in the body of the administrative charge. The court reasoned that as a supervisory employee, his interests were essentially those of the employer; further, the supervisor had received notice of the charges, participated in the administrative investigation, and could have settled.  *Id*. at 122.  The court explained,

32

> [t]he function of an administrative complaint is to provide the basis for an investigation into an employee's claim of discrimination against an employer, and not to limit access to the courts. A strict rule [that only a party named in the caption of the administrative complaint may be sued, regardless of any other circumstances] would harm victims of discrimination without providing legitimate protection to individuals who are made aware of the charges through the administrative proceeding. If [individual defendants] are described in the charge as the perpetrators of the harm, they can certainly anticipate they will be named as parties in any ensuing lawsuit.

*Id.* Therefore, the court concluded plaintiff had satisfied her duty to exhaust her administrative remedies. Similarly, in *Saavedra v. Orange County Consol. Transportation etc. Agency*, 11 Cal. App. 4th 824, 14 Cal. Rptr. 2d 282 (1992), the plaintiff filed an administrative complaint which charged her employer with discrimination and named an individual defendant in the body of the administrative charge though not in the caption. The court found that the individual defendant, having been named in the body of the administrative complaint, received proper notice. *Saavedra*, 11 Cal. App. 4th at 827. Again, in *Cole v. Antelope Valley Union High School Dist.*, 47 Cal. App. 4th 1505, 55 Cal. Rptr. 2d 443 (1996), as in *Martin* and *Saavedra*, plaintiff named a defendant in the body of the administrative complaint. "Consistent with *Valdez*, *Martin*, and *Saavedra*, we conclude plaintiff's lawsuit is viable as against [defendant] because he was named in the body of the administrative charge as a person who discriminated against plaintiff." *Id.*, 47 Cal. App. 4th at 1511. As to other defendants not named in the administrative complaint, the *Cole* court found that the plaintiff had failed to exhaust administrative remedies.

In light of the foregoing authorities, the Court concludes by analogy to California law interpreting the FEHA that under the CWPA, an employee exhausts his administrative remedies against a supervisor by naming that supervisor in the body of the charge and including a description

of the allegedly illegal actions taken by that supervisor.  Despite Plaintiffs' argument that they included their claims against Chatterjee in the body of their administrative CWPA claim, they have come forward with no evidence to support that contention[15]—a fact that is somewhat ironic, in light of Plaintiffs' willingness to file many pages of either irrelevant or inadmissible exhibits in support of their joint response brief.  In any event, in order to defeat summary judgment plaintiffs may not rely upon conclusory allegations or the contentions of counsel but rather must produce some specific factual support of their claim.  *See Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988).  In this instance, such factual support would have been those pages from the body of the administrative charge which they contend demonstrate that they exhausted their administrative remedy as to Chatterjee.  Having failed to provide that evidence, Plaintiffs fell short of meeting their burden on summary judgment.  Therefore, the Court will grant Chatterjee's motion for summary judgment on the CWPA claim asserted against her by both Plaintiffs.

In light of the foregoing, **IT IS THEREFORE ORDERED** that:

(1)    *Defendant Bani Chatterjee's Motion for Summary Judgment on Claims by Tommy Hook Based on Qualified Immunity and Other Grounds* [Doc. No. 91] is **GRANTED**;

(2)    *Defendant Bani Chatterjee's Motion for Summary Judgment on Claims by Charles Montano Based on Qualified Immunity and Other Grounds* [Doc. No 93] is **GRANTED**; and

(3)    Defendants' *Motion and Memorandum of Law in Support of Defendants' Motion to Strike Inadmissible Evidence Submitted in Response to Defendant Bani Chatterjee's Motion for Summary*

---

[15] Both Hook and Montano assert in their respective affidavits that their administrative whistleblower complaint contained allegations against Chatterjee.  However, these statements by Plaintiffs are inadmissible hearsay; in order to prove the contents of their whistleblower complaint, they were required to offer the document itself (or at least those pages relevant to Chatterjee). *See* Fed. R. Evid. 1002.

*Judgment* [Doc. No. 149] is **GRANTED IN PART** and **DENIED IN PART**, as further explained

herein.


_____
**UNITED STATES DISTRICT JUDGE**