## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**TOMMY RAY HOOK and**
**CHARLES MONTANO,**

**Plaintiffs,**

**vs.**                                                    **No. CIV. 05-356 JH/WPL**

**THE REGENTS OF THE UNIVERSITY**
**OF CALIFORNIA d/b/a LOS ALAMOS**
**NATIONAL LABORATORY, et al.,**

**Defendants.**

## MEMORANDUM OPINION AND ORDER

This matter came before the Court on *Defendant Richard Marquez's Motion for Summary Judgment on Claims by Tommy Ray Hook Based on Qualified Immunity & Other Grounds* [Doc. No. 119] and *Defendants John Bretzke, Vernon Brown and William Barr's Motion for Summary Judgment on Claims by Tommy Ray Hook Based on Qualified Immunity & Other Grounds* [Doc. No. 125]. The Court has reviewed and considered the hundreds of pages of briefs, exhibits, and affidavits filed by the parties and concludes that both motions should be granted in part and denied in part.

## LEGAL STANDARD

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When a defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part

test.  *See Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000).  The plaintiff must demonstrate that the defendant violated a constitutional or statutory right and that the right was clearly established at the time of the conduct.  *Id.*  "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Jantzen v. Hawkins*, 188 F.3d 1247, 1258 (10th Cir. 1999) (quoting *Greene v. Barrett*, 174 F.3d 1136, 1142 (10th Cir. 1999)).  Furthermore, "in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).  If the plaintiff establishes both elements of the qualified immunity test, then the burden shifts back to the defendant to show there are no genuine issues of material fact and that he is entitled to judgment as a matter of law.  *Nelson*, 207 F.3d at 1206.

## FACTUAL BACKGROUND

The following facts are either undisputed or, if disputed, they are viewed in the light most favorable to Plaintiff Tommy Ray Hook.[1]

During the period relevant to this lawsuit, Defendant Richard Marquez ("Marquez") was employed at Los Alamos National Laboratory ("LANL") as the Associate Director for Administration; defendant John Bretzke ("Bretzke") was the Division Leader for LANL's Supply Chain Management ("SUP") Division, defendant Vernon Brown ("Brown") was a Group Leader for procurement, and defendant William Barr ("Barr") was a Project Leader.  The Court refers to these

---

[1] As the Court has noted in past opinions in this case, both Plaintiffs' affidavits are rife with hearsay, speculation, testimony that is irrelevant to the motions at hand, and improper argument.  Thus, the Court has ignored portions of the affidavits that are not admissible or, if admissible, are not relevant to a particular Defendant's motion for summary judgment.

four individuals collectively as "Defendants."

**Speech by Hook**

Plaintiff Tommy Ray Hook ("Hook") began working for LANL in 1989.  Hook Aff. (Ex. G to Doc. No. 138) ¶ 2.  In 1994, LANL appointed him as Senior Advisor for Audits and as Acting Internal Audit Manager.  *Id*. ¶ 4.  Later that year, Katherine Brittin became Director of Audits and Assessments, as well as Hook's supervisor.  *Id*. ¶ 5.  In February of 1997, Hook was deposed by the plaintiffs' attorneys in a class action lawsuit challenging LANL's reduction in force.  In that deposition, Hook testified that Brittin had pressured him to conceal from the Department of Energy ("DOE") financial irregularities at LANL that he and his staff had discovered and that she threatened him with loss of raises, promotions, and with termination if he insisted on an aggressive audit approach that might reflect poorly on the University of California, which administered LANL.  *Id*. ¶ 17.  Hook reiterated that testimony at a public court hearing in March of 1997.  Hook points to no evidence in the record that Marquez, Bretzke, Brown, or Barr was aware of this deposition or court testimony.

In 2002, Hook sent Marquez an email describing financial and accounting illegalities that Brittin had covered up.  *Id*. ¶ 27.  Later that year, staffers from the Subcommittee on Oversight and Investigation of the Committee on Energy and Commerce of the United States House of Representatives contacted Hook about testifying regarding mismanagement and fraud at LANL. Hook told Marquez that he had been contacted by Congressional staffers and that he had agreed to testify.  *Id*. ¶¶ 28-29.  Again, there is no evidence that Bretzke, Brown, or Barr knew that Hook planned to testify.  In any event, the Committee did not call Hook to testify at its hearing in early 2003, *id*. ¶ 31, and there is no evidence that Hook ever testified before Congress.  However, in June of 2004 Hook provided information about his complaints of retaliation to United States Senator Pete

Domenici.  *Id*. ¶ 88.   In September of 2004, Hook and Montano filed a formal whistleblower retaliation complaint with the University of California under its Whistleblower Protection Policy. *Id*. at ¶ 92.   In October of 2004, Hook also testified before the New Mexico State Legislature's committee on oversight of LANL, stating that LANL had failed to release the SAPR Team's reports and that LANL needed a better mechanism for resolving whistleblower complaints.  *Id*. ¶ 94.

In the spring of 2003, Hook issued a report concerning his audit of LANL's Information Management Division which placed it in a negative light.  *Id*. ¶ 40.   It is not clear from the evidence in the record which of the defendants, if any, were aware of this audit.   In 2002-2003, Hook spoke out on behalf of students working at LANL, assisting them in contesting a decision by LANL to pay them less than they had been promised.  *Id*. ¶ 48.   Marquez pressured Hook to abandon these efforts. *Id*.   Again, there is no evidence that Bretzke, Brown, or Barr knew of Hook's speech on this issue.

In early 2003, Marquez assigned Hook to lead a new assessment and review unit within LANL's Business Operations ("BUS") Division focusing on internal controls.  *Id*. ¶ 33-34.   That unit eventually became known as the Self Assessment and Procurement Review Team ("SAPR Team") and initially reported directly to the BUS Division Leader.  *Id*.   The SAPR Team issued its first report in February of 2003, in which it identified problems with certain LANL procurement transactions involving double-billing by certain vendors and criticized LANL's Internal Audit program for failing to identify these improper charges.  *Id*. ¶ 37-38.   Later in April of 2003, after a reorganization of the BUS Division, the SAPR Team no longer reported to the BUS Division Leader, but rather to Barr, a project leader below group level in the newly created Supply Chain Management ("SUP") Division.  *Id*. ¶ 41, 49.   In July and August of 2003, Hook provided Marquez, Bretzke, Brown, and Barr with status reports on the SAPR Team's findings of numerous problems and improprieties in LANL's procurement.  *Id*. ¶ 53, 57, 61.   In October of 2003, the SAPR Team

4

and Hook completed the Procurement Self-Assessment Report for fiscal year 2003, which gave LANL's procurement a failing grade.  *Id.* ¶ 64, 66   On various occasions, Hook spoke to DOE officials regarding his audit work, despite threats from Marquez, Bretzke, and Barr that he would be fired if he released the actual SAPR report to DOE.  *Id.* at ¶ 65, 67, 69, 80, 84.

Hook complained periodically to Barr that the SAPR Team's work was too limited in scope, that the team was being forced to use improper auditing standards, and that its independence had been compromised  *Id.* at ¶ 42, 54, 55, 58, 69.  Hook made similar complaints to Marquez, *id.* at ¶ 75, 81, 83, Bretzke, *id.* at ¶ 55, 58, 79, 83, 85, and Brown, *id.* at ¶ 55, 58, 83, 85.

**<u>Alleged Retaliation</u>**

Barr and Brown admitted that Marquez refused to provide the SAPR Team's reports and findings to DOE.[2]  *Id.* at ¶ 52.  Barr also told Hook that Marquez and Bretzke had told him that they would fire Hook if Hook released the SAPR Team's reports directly to DOE.  *Id.* ¶ 69.  Although disputed by LANL, Hook contends that beginning in November of 2003 onward, unspecified "management" failed to provide the SAPR Team with work and provided no response to the SAPR Team's plans for the upcoming fiscal year.  *Id.* ¶ 71, 73.  Marquez delegated work reviewing internal controls at LANL to employees other than the SAPR Team.  *Id.* ¶ 73.  In December of 2003, Brown and Barr removed the pre-award audit function from the SAPR Team, *id.* ¶ 74, while Marquez gave the "subcontractors audit" work to another employee, *id.* ¶ 76, leaving the SAPR Team with no meaningful work to perform.  *Id.* ¶ 77.  Despite repeated requests from Hook, over the next several months Marquez never met with him to discuss the SAPR Team's draft plan for fixing the problems

---

[2] Though Defendants contend that these and similar statements by one Defendant quoting another Defendant are inadmissible double hearsay, in fact they are statements of parties opponent and are admissible as such.

it had identified.  *Id*. ¶ 78.

In February of 2004, Barr retired.  Barr Aff., Doc. No. 118, at ¶ 22.  However, Marquez refused to consider Hook to fill Barr's position.  Hook Aff. at ¶ 81.  Marquez appointed Tony Pace, who then transferred the SAPR Team's duties performing self-assessments to independent contractors.  *Id*.  This left the SAPR Team with little work or responsibility within the SUP Division.  *Id*.  In March of 2004, Brown forwarded a work assignment to Hook and his colleague on the SAPR Team, Co-Plaintiff Charles Montano.  However, the assignment was taken away and Brown said that he had his "hand slapped by Bretzke for giving [them] work."  *Id*. at ¶ 82.  In April or May of 2004, Brown told Hook that Bretzke had prohibited him from giving Hook or the SAPR Team members any work.  Later, Marquez confirmed that Bretzke had directed Brown to remove the self-assessment work from the SAPR Team.  *Id*. at ¶ 87.  Hook claims that in May of 2004, unspecified "management" retaliated against him by forcing him to work at an ergonomically unsafe work station.  *Id*. at ¶ 97.  On June 21, 2004, Bretzke transferred from SUP Division to the Project Management Division Office.  Bretzke Aff., Doc. No. 114, at ¶ 30.  On September 17, 2004, Brown left his employment at LANL.  Marquez Aff., Doc. No. 117, at ¶ 39.

Hook contends that since September of 2004, when he filed his formal whistleblower retaliation complaint with the University of California, unspecified "management" continued to retaliate against him by denying him work or responsibilities commensurate with his qualifications and experience, through early 2005.  Hook Aff. at ¶ 95.  He also claims that in November of 2004 Brown, along with other unspecified "management," fabricated criticisms against him in order to give him a negative performance evaluation.  *Id*. at ¶ 96.

6

## DISCUSSION

I.     **FIRST AMENDMENT CLAIM**

Under the First Amendment to the United States Constitution, a State may not discharge or take other adverse action against an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech. *Rankin v. McPherson*, 483 U.S. 378, 383 (1987). The Supreme Court has articulated a four-part test to determine whether a government employer violated a public employee's First Amendment speech rights. *Jantzen*, 188 F.3d at 1257. *See also Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1262 (10th Cir. 2005). First, the court must determine whether the employee was speaking as a citizen upon a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 146 (1983). If so, then the court must balance the interests of the employee, as a citizen, in expression upon matters of public concern and the government's interest "in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). This is known as the *Pickering* balancing test. A plaintiff's speech is protected by the First Amendment only if his interest outweighs the government's interest. *Dill v. City of Edmond*, 155 F.3d 1193, 1201 (10th Cir. 1998). If the employee prevails in this analysis, the Court must go on to examine the causal connection between the speech and the adverse employment action. *Weaver v. Chavez*, 458 F.3d 1096, 1099-1100 (10th Cir. 2006). Thus, if the first two requirements are met, the plaintiff must then show that the speech was a substantial or motivating factor in the employer's adverse employment action against him. *See Jantzen*, 188 F.3d at 1257. Fourth and finally, the government must demonstrate that it would have reached the same decision regardless of the protected speech. *Id.* The first two steps are legal questions to be resolved by the court, while the latter two steps involve questions of fact to be

resolved by the jury.[3]  *Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996).

### 1.       Speaking as a Citizen on a Matter of Public Concern

Speech involves a matter of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community.  *Witham v. Baptist Health Care of Oklahoma, Inc.*, 98 F.3d 581, 583 (10th Cir. 1996) (quoting *Connick*, 461 U.S. at 146).  Speech pertaining to internal personnel disputes and working conditions, however, ordinarily does not involve public concern.  *Gardetto*, 100 F.3d at 812.  A public employee's First Amendment rights are not implicated when the public employee speaks not as a citizen on a matter of public concern, but instead as an employee upon matters of only personal interest.  *Connick*, 461 U.S. at 147.  As the Supreme Court explained, "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."  *Connick*, 461 U.S. at 146.

In 1998, the Court of Appeals for the Tenth Circuit decided *Dill v. City of Edmond*, 155 F.3d 1193, 1201 (10th Cir.1998).  In *Dill*, a police officer brought a civil rights suit against his city employer, claiming he was demoted in retaliation for his attempt to bring to light exculpatory facts regarding certain homicides. 155 F.3d at 1199.  The district court dismissed on the basis that the speech was not constitutionally protected or, in the alternative, defendants were entitled to qualified immunity.  *Id*. at 1201.  Reversing, the Tenth Circuit held the police officer's speech was a matter of public concern because it was motivated by a desire to expose his employer's malfeasance.  *Id*.

---

[3] Of course, this assumes that a genuine issue of material fact exists for the jury to resolve, a question that the Court must determine when presented with a motion for summary judgment.

at 1202.  The *Dill* court, however, noted the speech would not have been of public concern if it merely had been a routine report disagreeing with the employer's position. *Id.*  Citing *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988), the court observed that "speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials ... clearly concerns matters of public import."  *Id.* at 1202.  In that regard, *Dill* is distinguishable from *Koch v. City of Hutchinson*, 847 F.2d 1436 (10th Cir. 1988), in which the Tenth Circuit held that a fire marshal's routine report regarding the cause of a fire did not involve a matter of public concern.  In *Koch* there was no evidence that the report was "motivated or inspired by . . . alleged improprieties or by the desire to expose those improprieties."  *Id.* at 1448.  In contrast, in *Dill* the plaintiff's speech was motivated by his concern that potentially exculpatory evidence was not being disclosed, and he continued to voice his concerns even after he was removed from the official investigation.  Thus, Dill's speech constituted more than a routine summary report.  Furthermore, Dill was motivated not by a desire "to air personal grievances or disputes with no relevance to the public interests," but rather to bring to light the possible mishandling of a murder investigation.  *See id.*

In 2006, after the events at issue in this case, the Supreme Court decided the case of *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951 (2006).  This decision changed the legal landscape of First Amendment speech retaliation cases by clarifying for the courts that they should initially focus on the question of whether a public employee was speaking as a *citizen* on a matter of public concern.  *Garcetti*, 126 S. Ct. at 1960.  In *Garcetti*, a deputy district attorney, after examining an affidavit supporting a search warrant, wrote a memorandum to his superiors stating his concerns that the affidavit contained serious misrepresentations and recommending dismissal of the case.  *Id.* at 1955-56.  Despite the plaintiff's concerns, his superiors decided to proceed with prosecution.  *Id.* at 1956.  The trial court held a hearing on a defense motion concerning the legality of the warrant,

and the plaintiff testified about his observations of the affidavit. *Id.* The trial court rejected the defense challenge to the warrant. *Id.* The plaintiff claimed that in the aftermath of these events he was subject to adverse employment actions, and he ultimately filed a 42 U.S.C. § 1983 claim based on violations of his First and Fourteenth Amendment rights. *Id.*

The Supreme Court concluded that the plaintiff's First Amendment rights were not violated because he was not speaking as a citizen on a matter of public concern. *See id.* at 1960. In so holding, the Court explained that when a citizen enters government service, he must accept certain limitations on his freedom in order for the government to provide efficient public services. *Id.* at 1958. The Court noted that "while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Id.* at 1959 (quoting *Connick*, 461 U.S. at 154). The Court nevertheless recognized that a citizen is still a citizen, and that employees speaking as citizens about matters of public concern must face only those speech restrictions necessary for the employers to operate efficiently and effectively. *Id.* at 1958.

In applying these principles in *Garcetti*, the Supreme Court concluded that the First Amendment did not protect the plaintiff's speech because "his expressions were made pursuant to his duties as a calendar deputy." *Id.* at 1959-60. The Court determined that the fact that the plaintiff spoke as a prosecutor fulfilling his responsibility to advise his superiors about how best to proceed with a case was the dispositive factor. *Id.* at 1960. The Supreme Court therefore held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.*

In this case, Hook argues that the following speech involved matters of public concern and

is therefore protected by the First Amendment: (1) his testimony in "administrative and judicial proceedings that was publicly reported in December 2002," which the Court construes to mean Hook's 1997 testimony during litigation regarding LANL's reduction in force; (2) his reports to DOE about LANL's suppression of audit reports in 2002 and 2003; (3) his "disclosures to the U.S. Congress" (by which the Court assumes Hook means his complaint to Senator Domenici in June of 2004) about suppression of critical audit reports; and (4) his disclosures of the SAPR Team findings to the DOE Inspector General.[4]  Doc. No. 146 at p.23; Doc. No. 144 at pp. 22-23.  Again, whether the First Amendment protects any of this speech is a question of law for the Court.  *Connick*, 461 U.S. at 148 n.7.

### a.  testimony in administrative and judicial proceedings

In February of 1997, Hook was deposed by the plaintiffs' attorneys in a class action lawsuit challenging LANL's reduction in force.  He testified that his supervisor had pressured him to conceal financial irregularities at LANL from DOE, and that she threatened him with loss of raises, promotions, and with termination if Hook, as internal audit manager, insisted on an aggressive audit approach that placed the University of California in a bad light.  Hook reiterated that testimony at a public court hearing in March of 1997.  Hook Aff. at ¶ 17.  Hook asserts that in November and December of 2002, the Albuquerque Journal ran a series of articles regarding an investigation of financial irregularities at LANL which disclosed his 1997 testimony.  In October of 2004, Hook also testified before the New Mexico State Legislature's committee on oversight of LANL, stating that LANL had failed to release the SAPR Team's reports and that LANL needed a better mechanism for resolving whistleblower complaints.  *Id*. ¶ 94. Defendants argue that this speech is "at least in

---

[4] Hook also refers to statements that he made to "the public [and] the press," but the Court has found no evidence of such statements in the record.

part related to personnel matters insofar as Hook has alleged that Ms. Brittin harassed and retaliated against him." Doc. No. 26 at p. 10. However, Defendants ignore the fact that the alleged harassment and retaliation were in response to alleged whistleblower speech by Hook, and therefore it was not a mere personnel matter. Viewed in the light most favorable to Hook, his testimony revealed an attempt to cover up an alleged misuse of public funds by LANL. The Court concludes that this constitutes protected speech on a matter of public concern under the First Amendment. As explained above, under *Connick*, *Conaway*, and *Dill*, speech is a matter of public concern if it is motivated by a desire to expose a public employer's malfeasance. Hook's testimony appears to satisfy that criteria. The fact that his speech took the form of sworn testimony in court or in a legislative proceeding also lends it additional protection. *See Lytle v. City of Haysville*, 138 F.3d 857, 864 n. 2 (10th Cir. 1998) (noting "[t]his circuit has concluded that a witness's sworn testimony in a court proceeding is entitled to heightened protection under the First Amendment").

### b. reports to DOE regarding suppression of audit reports and disclosures of the SAPR Team findings to the DOE Inspector General

As clarified in *Delgado v. Jones*, 282 F.3d 511, 514 (7th Cir. 2002), statements made in the course of the "routine discharge of assigned functions, where there is no suggestion of public motivation" do not indicate that the employee set out to speak as a citizen on matters of public concern. Thus, as Defendants correctly point out, the SAPR Team reports themselves do not constitute speech by Hook in his capacity as a "citizen," when in fact investigating and generating those reports was part of Hook's job assignment with LANL. *See also Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006). Hook acknowledges as much, stating that he "does not claim that the SAPR Report by itself is First Amendment speech." Doc. No. 146 at p. 23. However, if Hook spoke to representatives of DOE regarding accounting irregularities documented by the SAPR Team reports

in an effort to expose alleged improprieties, and if he did so in violation of directives from his LANL supervisors to keep the information away from DOE, then Hook would not be acting as a LANL employee.  Instead, he would be speaking as a citizen on a matter of public concern.  *See Delgado*, 282 F.3d at 519 (where the statement at issue arose from a discretionary act involving independent judgment and action, the speech is more likely to suggest the employee spoke as a citizen on a matter of public concern).  Indeed, in his brief Hook implies that he defied his LANL managers, including Defendants, by disobeying their orders and disclosing information about the SAPR Team reports to DOE.

A review of the affidavit testimony cited by Hook reveals one instance in which he alleges that he revealed the contents of a SAPR Team report to DOE, Hook Aff. at ¶ 80, despite repeated orders not to do so.  *Id*. at ¶ 67, 80.  In his Second Supplemental Affidavit (Ex. D to Doc. No. 144 at ¶ 10), Hook further alleges that he provided Ron Archuleta of the DOE Inspector General's office information regarding "unallowable and questionable costs identified by the SAPR Team."  Hook complained to Bretzke about withholding the SAPR reports from DOE.  *Id*. at ¶ 80.  Hook also contends that he reported to DOE that LANL officials were suppressing his unfavorable audit reports.  His original Affidavit states at paragraph 67 that DOE officials "repeatedly spoke with me, through early 2004, to find out when the Lab planned to release to DOE the Procurement Self Assessment Report.  I told them that I had been warned not to release the report, and that I would be fired if I did so."  The Court concludes that, viewed in the light most favorable to Hook, these statements to DOE were protected First Amendment speech by a citizen on a matter of public concern.

### c.  disclosures to U.S. Congress

In light of the absence of testimony at a Congressional hearing, Hook's only "disclosure"

13

to Congress occurred in June of 2004, when he "provided information about [his] complaints [of retaliation] to U.S. Senator Domenici." Hook Aff. ¶ 88. This is the sum total of the information that Hook has provided to the Court regarding his speech to the Senator, though he does contend that in response Senator Domenici asked for a report from LANL. *Id*. Though Hook's evidence is extremely thin, the Court concludes that a reasonable jury could infer that Hook's communications were motivated by a desire to expose government malfeasance. Therefore, this is protected speech on a matter of public concern.

### 2.  *Pickering* Balancing Test

Under the *Pickering* balancing test, the employer must demonstrate that the adverse action was necessary to prevent the disruption of official functions. *Dill*, 155 F.3d at 1203. In conducting the required balancing of interests, the court examines the manner, time, and place of the speech, as well as the context in which the dispute arose. *Connick v. Myers*, 461 U.S. 138, 152-53 (1983). Other relevant factors for this analysis include whether the speech impairs discipline by superiors or harmony among co-workers, has a detrimental impact on working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with normal governmental operations. *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). The burden is on the employer to establish such disruptive effects. *Dill v. City of Edmond*, 155 F.3d 1193, 1204 n. 5 (10th Cir. 1998). The government, however, cannot rely on purely speculative allegations of governmental disruption. *Gardetto*, 100 F.3d at 815-16. The government must thus articulate specific reasonable concerns of harm that are made in good faith. *Id.* at 816.

In this case, Defendants do not argue that their interest in regulating Hook's speech outweighed his interest in his First Amendment rights or was otherwise necessary to prevent the disruption of official functions. Instead, Defendants contend that they simply did not restrict Hook's

speech in any manner.  The Court concludes that while there is a fact dispute on this element, viewed in the light most favorable to Hook there exists sufficient evidence to support the conclusion that Defendants did in fact attempt to regulate and restrict Hook's speech regarding problems at LANL.  For example, Hook has presented evidence that in January of 2003, he met with Marquez to discuss his proposed testimony before the House Subcommittee on Oversight and Investigation of the Committee on Energy and Commerce regarding mismanagement and fraud at LANL.  In his Affidavit, Hook contends that Marquez asked him, "What do you want?" in a manner that suggested to Hook that Marquez was trying to offer him something in exchange for Hook's agreement not to testify before the Committee.  Hook Aff. at ¶¶ 28-30.  In addition, the record contains conflicting evidence regarding whether LANL representatives ever sent the SAPR Report and the negative findings contained therein to DOE.  Defendants claim that they did, but Hook has come forward with evidence to the contrary, including evidence that the "Holder Report" that LANL did provide to DOE did not, as Defendants claim, incorporate the negative findings of the SAPR Team report, Hook 2d Supp. Aff. at ¶ 4 (Doc. No. 144, Ex. D), evidence that DOE officials continued to ask him for the report (something that would be unnecessary if they already had the information), id. at ¶ 8, and evidence that Defendants Barr, Bretzke, and Marquez threatened to fire him if he furnished the SAPR Report information to DOE. Hook Aff. at ¶ 67, 69.  For example, Hook states in his Affidavit that Bretzke, Barr and Brown told him that Marquez was "stonewalling" DOE by refusing to provide SAPR Team reports to DOE.[5]  Id. at ¶ 52, 70.

     In short, the Court concludes that at the summary judgment stage, Hook prevails on this

---

[5] Defendants object on hearsay grounds to evidence in Paragraphs 52 and 69 of Hook's Affidavit regarding what certain Defendants said to Hook.  However, the statements are not hearsay, but rather admissions by parties opponent under Fed. R. Evid. 801(d)(2), and are therefore admissible.

portion of the analysis.

### 3.        Substantial or Motivating Factor in Adverse Employment Action

If the first two *Pickering/Connick* requirements are met, the plaintiff must then show that the speech was a substantial or motivating factor in the adverse employment action. *See Jantzen*, 188 F.3d at 1257.   The Supreme Court has held that a plaintiff need not prove termination in order to successfully assert a claim for First Amendment retaliation; rather denial of promotions, transfers and other employment opportunities may give rise to First Amendment claims. *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 72-73 (1990);  *see also Wren v. Spurlock*, 798 F.2d 1313, 1318 (10th Cir. 1986) (public school teacher who was harassed, reprimanded and suspended because of her complaints about school conditions could state First Amendment claim); *Schuler v. City of Boulder*, 189 F.3d 1304, 1309-10 (10th Cir. 1999) (written reprimand, removal of important job duties, a low score on a performance evaluation, and involuntarily transfer amounted to sufficiently adverse employment action). *Compare Lybrook v. Members of Farmington Mun. Schs. Bd. of Educ.*, 232 F.3d 1334, 1340 (10th Cir. 2000) (neither the employer's issuance of a "Corrective Action Plan" requiring the plaintiff to "[s]trive to create an atmosphere that will nurture collaboration with all colleagues" and to "conduct affairs with a conscious concern for the highest standards of professional commitment," nor requiring the plaintiff to attend weekly meetings with her supervisor constituted an adverse employment action).   In 2005 the Tenth Circuit observed that Title VII's standard for a retaliatory adverse action is different from that under the First Amendment, and that the First Amendment standard was less stringent.   In *Baca v. Sklar*, 398 F.3d 1210, 1220 (10th Cir. 2005), the Court stated that an employer's actions can satisfy the adverse employment action requirement in the First Amendment context even if the same action is insufficient to satisfy the

16

adverse employment action requirement under Title VII.[6]

> a.    **adverse employment actions**

Thus, the first question the Court must answer is whether there is a genuine issue of material fact regarding Hook's claim that the Defendants caused him to suffer an adverse employment action. Though Defendants hotly dispute the evidence on this issue and offer evidence to the contrary, Hook has presented evidence that Marquez[7] removed or reduced his work responsibilities to only procurement issues and removed the SAPR Team (of which Hook was the leader) from supervision by a division lead to reporting to Barr, a section leader, several layers lower in the organization. Hook Aff. at ¶¶ 41, 49, 73, 76, 81.  *See also* Hook 2d Supp. Aff. at ¶ 5-6.  A jury might reasonably interpret this as a demotion.[8]  He has also submitted evidence that Bretzke, Brown, and Barr all concurred in the reduction of his work assignments.  Hook Aff. at ¶ 55, 58, 74, 81-83, 87.  He also alleges that Barr denied him work assignments, and that Brown refused to intervene.  *Id.* at ¶ 72.

However, some of Hook's evidence is too vague to be credited on these issues.  For example, Hook claims, without further support, that "the Lab retaliated against [him] through an unjustified downgrade in [his] performance evaluation for the FY 2003 performance period."  *Id.* at ¶ 68.

---

[6] For the reasons set forth in this Court's opinion entered March 29, 2007 [Doc. No. 185], the Court concludes that this analysis remains unchanged by the Supreme Court's decision in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405 (2006), a case involving retaliation in violation of Title VII.

[7] In his Affidavit [Doc. No. 117] at ¶¶ 14, 22-23, Marquez acknowledges that he led the organizational restructuring of BUS Division that led to its split into the CFO Division and SUP Division.  One could infer from this evidence that he approved the placement of the SAPR Team under Barr's leadership in the SUP Division.

[8] However, Hook has presented no evidence that Bretzke, Brown, or Barr participated in any way in the administrative reorganization that led to the asserted demotion of Hook and the SAPR Team.

17

Though Hook contends that he discussed the evaluation with Brown, Hook does not specify who was ultimately responsible for the evaluation, and it is impossible to know who Hook includes in the term "the Lab."  The evaluation itself gives Hook a total ORC score of 7.5 (out of a possible 10), and the written portion gives a glowing description of his work.  Cortesy Aff., Doc. No. 112, at Ex. 7.  There is no evidence in the record that this score represents a negative evaluation.  Indeed, there is testimony by one witness that an ORC score of 6.0, one and a half points below what Hook received, represents a "solid performer."  Chatterjee Int. [Ex. A to Doc. No. 138] at p. 63.  Though the performance summary may not give Hook the praise he feels that he deserves, even viewing it in the light most favorable to Hook the Court cannot say that it amounts to an adverse employment action against him.  The same is true of the performance evaluation Hook received the following year, which indicates that it was from Bill Wadt, who is not a defendant in this case.  Cortesy Aff., Doc. No. 112, at Ex. 8.  It also contains an ORC score of 7.5 and many glowing comments of his work, though it does also contain some criticism of his alleged lack of ability to compromise or accept criticism from his managers.  The fact that the person responsible for the evaluation disagreed with Hook's own perception of his management approach and expressed that disagreement in the performance evaluation does not amount to an adverse employment action, even under First Amendment standards.  *See Pippin v. Burlington Resources Oil and Gas Co.*, 440 F.3d 1186, 1196 (10th Cir. 2006); *Simms v. Oklahoma*, 165 F.3d 1321, 1329 (10th Cir. 1999).

Similarly, Hook contends that from November 2003 onward, so-called "management" gave virtually no work to the SAPR Team, nor did "management" provide any response to the SAPR Team's plans for upcoming self-assessments.  *Id.* at ¶ 71, 73.  It is impossible to determine which

18

of the Defendants, if any, Hook includes in the terms "the Lab" and "management."[9]  Hook also

contends that Albert Jiron gave him a poor performance appraisal and gave credit for some of his

work to co-defendant Montano, all at the behest of Marquez.  Doc. No. 144 at pp. 20, 29-30.  As

evidence Hook cites to Mr. Jiron's deposition testimony (Ex. B to Doc. No. 145), but Jiron's

testimony does not support Hook's assertion that Marquez authorized him to give credit for Hook's

work to another.   Similarly, Hook contends that sometime after May of 2004 unspecified

"management" retaliated against him by forcing him to work at an ergonomically unsafe desk, but

he fails to present evidence linking that action to any of the Defendants. Hook Aff. at ¶ 97.  Finally,

Hook's "evidence" regarding his contention that he was underpaid relative to similarly situated

LANL employees is both based upon hearsay and is too sparse to create a genuine issue of material

fact.  *See* Hook Aff. at ¶ 89 (alleging that he was underpaid, but providing no basis for personal

knowledge, supporting information, or comparisons to similarly situated employees).  As a result,

Defendants' evidence attesting that Hook's salary was actually above the average of that of his peers

is essentially uncontested.  Marquez Aff., Doc. No. 117, at ¶ 36-37; Garcia Aff., Doc. No. 116, at

¶ 3-9.

      After reviewing all of the foregoing, the Court concludes that Hook has come forward with

sufficient evidence to create a genuine issue of material fact on the question of whether he suffered

an adverse employment action by Marquez, Bretzke, Brown, and Barr in the form of a reduction in

his work assignments and responsibilities, and by Marquez in the form of an effective demotion by

being told to report to a section leader instead of a division leader.  Hook has failed to create a fact

---

[9] The one exception is that Hook avers that in mid-November of 2003, Marquez decided
to assign a project reviewing internal controls at LANL to Barr and another employee instead of
to the SAPR Team, in contravention of the SAPR Team's plan for fiscal year 2004.  Hook Aff.
at ¶ 73.

issue on whether his performance evaluations constituted adverse employment actions, on whether he was forced to work at an ergonomically improper work-station, or on whether he was underpaid relative to similarly situated employees.

### b.   motivating factor

It is not enough for Hook to demonstrate that he engaged in protected speech and that he suffered an adverse employment action at the hands of Defendants.  He must also demonstrate the existence of a genuine issue of material fact on the question of whether his protected speech on a matter of public concern motivated the adverse employment action in question.  This is problematic for Hook, as discussed below.

What constitutes a substantial motivating factor evades precise definition. An employee "need not prove his speech was the sole reason for defendants' action." *Copp v. Unified Sch. Dist. No. 501*, 882 F.2d 1547, 1554 (10th Cir. 1989).  Nor is the employee required to show "but-for" causation; that is, to demonstrate but-for the employee's speech the subsequent employment action would not have occurred.  *See Spiegla v. Hull*, 371 F.3d 928, 941-43 (7th Cir.2004). Rather, the employee must show the protected speech played a substantial part in the employer's decision to adversely alter the employee's conditions of employment. *Maestas v. Segura*, 416 F.3d 1182, 1188 (10th Cir. 2005).  Thus, "[t]o withstand summary judgment at step three, therefore, an employee must produce evidence linking the employer's action to the employee's speech." *Id*.  While an adverse action in close proximity to protected speech may warrant an inference of retaliatory motive, temporal proximity alone is insufficient to establish such speech as a substantial motivating factor in an adverse employment decision.  *Id*. at 1189.  "An *employer's knowledge* of the protected speech, together with close temporal proximity between the speech and challenged action, may be sufficiently probative of causation to withstand summary judgment." *Id.* (emphasis added). *See*

*also Morfin v. City of East Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003) (explaining that protected conduct cannot be a basis for retaliation where defendants did not know of such conduct).

Hook suggests that Defendants attempted to curry his favor during the period January through May of 2003, when Congressional hearings were taking place in which he had agreed to testify, and then Defendants retaliated against him after the hearings were over.  Doc. No. 144 at p. 26; Doc. No. 146 at p. 14.  If Hook had actually testified at those Congressional hearings, then it is quite possible that would raise a reasonable inference of retaliation after such testimony.  However, as discussed above, Hook did not actually testify at those hearings, and therefore he engaged in no protected speech that could motivate an adverse employment action against him.

As the Court has already found, Hook did engage in protected speech in 1997, when he gave a deposition and testified in open court in the LANL reduction-in-force case.  However, the adverse employment actions that he complains of in this case did not begin until six years later, in late 2003.  Thus, there is a significant temporal disconnect between the protected speech and the alleged retaliation.  In addition, Hook has presented no evidence that any of the Defendants even knew about his testimony in 1997 or were aware of the press reports regarding that testimony that he contends were printed in late 2002.  Thus, the Court concludes that there is no genuine issue of fact as to Defendants' retaliatory motivation with regard to that testimony.

In October of 2004, Hook also testified before the New Mexico State Legislature's committee on oversight of LANL, stating that LANL had failed to release the SAPR Team's reports and that LANL needed a better mechanism for resolving whistleblower complaints.  *Id.* ¶ 94.  It is impossible that Barr could have retaliated against Hook for this speech, because he had retired from LANL eight months earlier, in February of 2004.  Similarly, Brown had left LANL in September of 2004, one month before this speech by Hook.  In June of 2004, Bretzke had transferred from the

SUP Division to the Project Management Division Office, where he apparently had no more management responsibilities toward Hook. Bretzke Aff. [Doc. No. 114] at ¶ 30. As for Marquez, Hook fails to point to (nor can the Court find) evidence from which a jury could infer that he even knew about Hook's testimony before the State legislative committee. Therefore, there is no genuine issue of material fact as to whether the Defendants retaliated against Hook for that testimony.

Hook also argues that Defendants retaliated against him for his reports to DOE regarding LANL's suppression of his and the SAPR Team's audit reports and for Hook's unauthorized disclosure of the SAPR Team findings to the DOE Inspector General. Once again, Hook points to no evidence to show that any of the Defendants knew of his disclosures to DOE or to the DOE Inspector General. Hook presents no evidence that either he or someone with DOE informed the Defendants of his speech.

Finally, Hook contends that he complained to Senator Domenici in June of 2004 regarding retaliation against him at LANL. Once again, it is impossible that Barr could have retaliated against Hook for this speech, because he had retired from LANL four months earlier, in February of 2004. Similarly, Hook has pointed to no evidence demonstrating that any of the remaining Defendants knew that he had spoke to Senator Domenici about these matters and could have retaliated against him because of that speech.

Having found that there is no genuine issue of material fact on whether Hook's protected speech was a motivating factor in an adverse action against him, the Court concludes that Defendants are entitled to summary judgment on his First Amendment claim. Although Defendants couched their motion for summary judgment in terms of qualified immunity, there is no need to undertake the qualified immunity where the Court has found that no constitutional violation occurred. *See Petersen v. Farnsworth*, 371 F.3d 1219, 1224 (10th Cir. 2004) (declining to consider

defendants' entitlement to qualified immunity where no constitutional violation occurred).

## II.    CALIFORNIA WHISTLEBLOWER PROTECTION ACT CLAIM

Defendants argue in summary fashion that they are entitled to summary judgment on Hook's California Whistleblower Protection Act claim (CWPA) in Count II of the Amended Complaint. This Court  previously granted summary judgment to Defendant Patrick Reed on both the First Amendment and CWPA claims against him on the grounds that Plaintiffs' had failed to come forward with any evidence to create a genuine issue of material fact on whether Reed participated in any retaliatory acts against them.  Indeed, the record evidence showed that Reed had no authority to make personnel decisions (retaliatory or not) within LANL.  Therefore, given the evidence in the record it was logical to conclude that Reed was entitled to summary judgment on Hook's claims against him under the CWPA.

That is not the case here, where it is undisputed that at one time or another each of the Defendants had some form of management authority over Hook.  Rather, the question before the Court now is whether Hook engaged in speech that is protected by the CWPA, which may define a "protected disclosure" by a University of California employee differently than the First Amendment defines "protected speech on a matter of public concern."  Similarly, First Amendment jurisprudence and the CWPA may take different views on what constitutes an actionable "adverse employment action" under the First Amendment as opposed to "reprisal, retaliation, threats, coercion, or similar improper acts" under the CWPA.  Finally, the two causes of action may have different means of addressing a finding of causation and motivation.  The Defendants make no effort to address any of these issues.  Accordingly, their motion for summary judgment on this claim will be denied.

**IT IS THEREFORE ORDERED** that *Defendant Richard Marquez's Motion for Summary*

*Judgment on Claims by Tommy Ray Hook Based on Qualified Immunity & Other Grounds* [Doc. No. 119] and *Defendants John Bretzke, Vernon Brown and William Barr's Motion for Summary Judgment on Claims by Tommy Ray Hook Based on Qualified Immunity & Other Grounds* [Doc. No. 125] are both **GRANTED IN PART** and **DENIED IN PART**.  As explained above, Defendants are entitled to summary judgment on Hook's claims for violation of his First Amendment rights under 42 U.S.C. § 1983, but they are not entitled to summary judgment on his claim under the California Whistleblower Protection Act.


_____
**UNITED STATES DISTRICT JUDGE**