IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

TOMMY RAY HOOK and
CHARLES MONTANO,

                    Plaintiffs,

vs.                                                    No. CIV. 05-356 JH/WPL

THE REGENTS OF THE UNIVERSITY
OF CALIFORNIA d/b/a LOS ALAMOS
NATIONAL LABORATORY, et al.,

                    Defendants.


## MEMORANDUM OPINION AND ORDER

       This matter came before the Court on *Defendants Marquez, Bretzke, Brown, and Barr's Motion for Summary Judgment on Claims by Charles Montano Based on Qualified Immunity & Other Grounds* [Doc. No. 110].  The Court has reviewed and considered the hundreds of pages of briefs, exhibits, and affidavits filed by the parties and concludes that the motion should be granted in part and denied in part.

## FACTUAL BACKGROUND[1]

       On March 6, 2007, this Court entered a Memorandum Opinion and Order granting summary judgment in favor of Defendant The Regents of the University of California d/b/a Los Alamos National Laboratory ("the University") on its counterclaim against Plaintiff Charles Montano

---

[1] On at least two previous occasions in this case, the Court has set forth the applicable standards for reviewing a motion for summary judgment based upon qualified immunity.  *See, e.g.,* Doc. Nos. 217 and 185.  The Court will not repeat that standard here.  In addition, as the Court has noted in past opinions in this case, both Plaintiffs' affidavits are rife with hearsay, speculation, testimony that is irrelevant to the motions at hand, and improper argument.  Many other exhibits are either inadmissible or irrelevant.  Thus, the Court has ignored portions of various exhibits that are not admissible or, if admissible, are not relevant to a particular Defendant's motion for summary judgment.

("Montano") for breach of a settlement agreement and release that went into effect on May 11, 2000. *See* Doc. No. 181. As a result of that release, Montano is barred from asserting claims against Defendants arising from or relating to events prior to May 11, 2000. Accordingly, the Court has considered the facts in light of the release and the Court's March 6, 2007 opinion. Viewing the facts through that lens, the following facts are either undisputed or, if disputed, they are viewed in the light most favorable to Montano.

## Speech by Montano

Montano began working at LANL in 1978. Montano Aff.[2] at ¶ 3. In 1987, the University's Office of the President hired him as Senior Auditor in the Internal Audit Group, which was then operated directly by the University. *Id*. In 1991, the University promoted Montano to Principal Auditor. *Id*. In February of 2002, Defendant Rich Marquez ("Marquez") became Associate Director for Administration at LANL, responsible for overseeing LANL's business and administrative services, including five LANL Divisions and five smaller organizations. Marquez Aff. at ¶¶ 3, 5. In 1999, Montano became a project leader in the BUS group. Montano Aff. at ¶ 21.

In March of 2002, in an email message Montano complained to Marquez that neither he nor another qualified Hispanic was chosen for a group leader position filled by defendant Bani Chatterjee ("Chatterjee"). In that message Montano made reference to his testimony before the New Mexico Legislature (regarding alleged accounting irregularities at LANL) as well as his prior

---

[2] All citations to "Montano Aff." refer to the Affidavit of Charles Montano, attached as Exhibit K to Doc. No. 138, his response to defendant Bani Chatterjee's motion for summary judgment. As in past opinions, the Court declines to consider those portions of the affidavit that consist of hearsay, speculation, and conclusions. Also, consistent with its past opinions, the Court will not consider statements in the Affidavit to the effect that unspecified "management" or "the Lab" took certain actions, as it is impossible from such statements to determine which, if any, of the individual defendants had a role in such events. *See*, as merely one example, Paragraph 51 of Montano's Affidavit, in which he states that "management" denied the SAPR Team the resources it needed to complete its FY 2003 procurement self-assessment report, and describing Hook's efforts to appeal to "management" about assigning work.

whistleblower settlement with LANL.  *See* Ex. A to Doc. No. 111.

On October 21, 2002, Montano testified before a joint New Mexico-California legislative committee on LANL oversight.  Montano Aff. at ¶ 31.  Montano testified that the Hispanic Round Table, of which he was chairman, had concluded that LANL was in violation of federal anti-discrimination laws, and that LANL had refused to release a study of pay disparities at LANL known as the "Welch study."[3]  *Id*.  Montano comes forward with no evidence that Defendants Bretzke, Barr, or Brown knew about his testimony at that hearing.

The SAPR Team completed its FY 2003 report on October 20, 2003 and gave procurement a failing grade, based on a finding that 35% of procurement transactions were out of compliance. Montano Aff. at ¶ 53.  On several occasions, DOE officials questioned Montano about the status of the SAPR Report, and Montano directed them to speak to Hook.  *Id*.

On March 9, 2004, Montano filed a whistleblower complaint with the Department of Energy's Inspector General ("DOE IG") regarding alleged retaliation, removal of his work, and LANL's alleged suppression of audit reports.  Montano Aff. at ¶ 61; Montano Supp. Aff. at ¶ 3. Montano, along with Plaintiff Tommy Hook ("Hook") also provided DOE IG with data that had been included in the SAPR Team's October 2003 reports.  *Id*.  In the spring and summer of 2004, Montano lodged complaints with University of California officials, a member of Congress, and the DOE IG complaining of retaliation against him and Hook.  *Id*. at ¶ 66-67.  On July 13, 2004, Montano requested whistleblower protection status from the DOE IG.  *Id*. at ¶ 69.  Then, on September 7, 2004, Hook and Montano filed a formal whistleblower retaliation complaint with the

---

[3] Hook and Montano's relatively vague testimony regarding the contents of the Welch study is inadmissible hearsay, and it appears that the Plaintiffs did not attach the study itself as an exhibit to any of their papers.

University of California under its Whistleblower Protection Policy. *Id.* at ¶ 74. On October 15, 2004, Hook and Montano testified before the New Mexico legislative committee on LANL oversight, stating that LANL had failed to release the SAPR reports to DOE and that LANL needed a better mechanism for resolving whistleblower complaints. *Id.* at ¶ 77. Again, there is no evidence that Defendants Bretzke, Barr, or Brown knew anything about any of the foregoing speech by Montano.

**Alleged Retaliation**

In February of 2002, Montano became acting Team Leader of the General Accounting and Work for Others Team within LANL's BUS-1 group, while the permanent team leader was on assignment to another project. Montano's team, mostly accountants, was responsible for the monthly and yearly closing process, reconciliation for all bank accounts, maintaining the general ledger using data from systems throughout LANL, and various other accounting and reporting activities. Then, the BUS-1 Group Leader (a position presumably above the Team Leader) resigned and LANL advertised the position. Montano competed for the position, but in April of 2002 Chatterjee was chosen. Shortly after she became the Group Leader, Chatterjee opened up for competition the Team Leader position then occupied by Montano in an "acting" capacity. Again, Montano applied for the job. Chatterjee asked Montano if he still wanted the Team Leader position and told him that it was not a promotion, had long hours, and would carry no pay raise. Montano inferred from Chatterjee's statements that she did not want him to apply for the job, but he did so anyway. A screening committee (which included Chatterjee and three others) interviewed the candidates and ranked another employee first and Montano second. Chatterjee told Montano that "it was a close call" and "another person was equally qualified." However, on July 19, 2002, Chatterjee ultimately offered Montano the position at the direction of Defendant Richard Marquez

("Marquez").[4]   Marquez Aff. ¶¶ 9-10.

In March of 2002, Montano asked Marquez to be his mentor at LANL.  Marquez told Montano that due to the responsibilities of his new position, he did not have time to serve in a mentoring relationship.  Marquez Aff. at ¶¶ 7-8.  In November of 2002, Montano wrote to Marquez complaining about Chatterjee's management style and her treatment of him, and asked to be moved to another organization.  *See* Marquez Aff. at ¶ 11; Ex. C to Montano Supp. Aff., attached to Doc. No. 145.  Marquez took no action at that time.  *Id.*

In early 2003, as part of LANL's efforts to correct problems in its business operations, Marquez asked acting Chief Financial Officer Jim Lopez to propose an organizational restructuring of LANL's Business Operations ("BUS") Division.  Marquez Aff. at ¶ 14.  That spring, Lopez provided Marquez with several restructuring options.  *Id.* at ¶ 22.  Marquez chose to split BUS Division into two separate divisions: Chief Financial Officer ("CFO") Division and Supply Chain Management ("SUP") Division.  *Id.* at ¶ 22.  In the meantime, in March of 2003, Montano left the BUS general accounting group and went to work for the Self Assessment and Procurement Review Team ("SAPR"), headed by Hook.  Montano Aff. at ¶ 40.  As a result of the restructuring, project leader William Barr ("Barr") and his direct reports, including Plaintiffs and the rest of the SAPR Team, were moved from the Division office to the Procurement Group within SUP Division, where they continued to report to Barr.  Marquez Aff. at ¶ 23; Barr Aff. at ¶¶ 7-9.  According to Montano, during this time Marquez retaliated against Hook, the leader of the SAPR Team, and Montano by removing finance issues from the focus of the SAPR Team and limiting its work to procurement

---

[4] Although Montano contends in his affidavit that "the Lab's Legal office," and not Marquez, intervened to ensure that Montano was hired as team leader, his statement is based on inadmissible hearsay.  *See* Montano Aff. ¶ 25.

problems, and by placing SAPR under the purview of Barr, who was a section leader (as opposed to placing it under the division office).  Montano Aff. at ¶ 43, 46.  Montano contends that he complained to Defendants Barr, John Bretzke ("Bretzke"), and Vernon Brown ("Brown") that being on a team focused only on procurement would stifle his career, and that he and other SAPR Team members had their responsibilities removed (though he does not specify by whom).  *Id*. at ¶ 47.  According to Montano, he had no work to do for nine months.  *Id*.

Also, Montano contends that Bretzke removed from the SAPR Team the assignment of validating findings under LANL's new Business Process Improvement Program.  *Id*. at ¶ 44.  In November and December of 2003, Marquez gave the task of reviewing LANL's internal controls to John Tapia and Barr, and Barr removed the pre-award audit function from the SAPR Team, leaving the team with no meaningful work.  *Id*. at ¶¶ 56-57.  Barr retired in February of 2004.  Barr Aff. at ¶ 22.  Thereafter, Barr's replacement, Tony Pace, told Montano that the SAPR Team would no longer do self-assessments, which was its primary mission.  *Id*. at ¶ 59.

In May of 2004, Hook transferred to LANL's Prime Contract Office, leaving Montano as the only remaining member of the SAPR Team, and he had no work to do.  *Id*. at ¶ 64.  The following month, Montano and Hook asked Marquez to adjust their performance evaluations for FY 2004 to match those for FY 2003 and to give them a performance award based on their work on the SAPR Team's self-assessment report.  *Id*.  at ¶ 65.  *See also* Marquez Aff.  at ¶¶ 31-32.  Marquez agreed to ensure that both Hook and Montano would receive the same ORC scores that they had received in the prior year's performance evaluations and agreed to assist them in getting reassigned.  Marquez Aff. at ¶ 33.

In August of 2004, in reliance upon the Welch study, Hook requested that Marquez raise

6

Montano's pay.[5]  Montano Aff. at ¶ 71.  Marquez asked a human resources employee to look into Montano's salary history, and that individual concluded that Montano's salary was in line with that of his peers.  Marquez Aff. at ¶¶ 36-37; Arthur Garcia Aff. at ¶ 8, 10.  Thus, Marquez did not raise Montano's salary.  In response to his repeated requests for work, in August of 2004 Montano was assigned to work as a recruiter of accounting and financing staff for LANL's CFO Division, a position for which he felt overqualified.  Montano Aff. at ¶ 73.  Although he provides the Court with no evidence regarding the specific details of the recruiting job (duties, responsibilities, experience, education, and training requirements, compensation, etc.) Montano characterizes this job in conclusory fashion as "a mere lateral move with no salary increase and no leadership responsibilities" and he contends that work is not commensurate with his qualifications and experience.  *Id*. at ¶ 73, 76.  Effective September 17, 2004, Brown left his employment at LANL.

On December 2, 2004, Albert Jiron, who is not a party to this lawsuit but was Marquez's chief of staff, prepared Montano's performance evaluation without seeking input from Montano's previous supervisor, Hook, or from his current supervisor.  *Id*. at ¶ 78.  Jiron's evaluation erroneously gave Montano credit for work that he did not do or for work that he did outside of the evaluation period.  *Id*.  Also, the evaluation failed to document the fact that Montano was kept idle for much of the evaluation period.  *Id*.  There is no evidence that any of the individual Defendants participated in preparing the evaluation.

---

[5] As was also the case with Hook, Montano's "evidence" regarding his contention that he was underpaid relative to similarly situated LANL employees is based upon hearsay and unsubstantiated references to the unattached Welch study, and is too sparse to create a genuine issue of material fact.  *See* Montano Aff. at ¶71 (alleging that he was underpaid, but providing no basis for personal knowledge, supporting information, or comparisons to similarly situated employees).  As a result, Defendants' evidence attesting that Montano's salary was actually in line with that of his peers is essentially uncontested.

## DISCUSSION

In its recent opinion regarding the individual Defendants' motions for summary judgment on the claims by Tommy Hook [see Doc. No. 217], the Court discussed at length both the standard for reviewing motions for qualified immunity and the elements of a First Amendment retaliation claim. The Court will not repeat those discussions here, but instead incorporates them by reference.

## I.   FIRST AMENDMENT RETALIATION CLAIM

As discussed in *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1262 (10th Cir. 2005), the Supreme Court has set forth a four-part test to determine whether a government employer violated a public employee's First Amendment speech rights. These include (1) whether the speech is on a matter of public concern; (2) the *Pickering* balancing test; (3) whether the speech was a substantial or motivating factor in the employer's adverse employment action against the plaintiff (plaintiff's burden); and (4) whether the government would have reached the same decision regardless of the protected speech (government's burden).

### A.   Speech on a matter of public concern

In his response brief, Montano identifies his protected speech as follows: (1) speech made to the individual defendants in the course of performing his job duties; (2) statements to DOE and DOE IG; (3) statements to the public; (4) statements to the press; (5) statements in judicial proceedings; (6) statements in DOE administrative proceedings; (7) his prior whistleblower complaint from the 1990's; (8) his statements in depositions. Doc. No. 145 at p. 21. Many of these examples of allegedly protected speech are either too vague or find no support in the evidentiary record. For example, the Court is unable to determine what Montano means by "statements to the public," and there is no evidence of statements by Montano to the press. (The press may have reported on statements that Montano made to others, but that is not the same thing, and in any event

8

such reports are inadmissible hearsay.)  The Court finds no specific evidence in the record of participation by Montano in any sort of "DOE administrative proceedings."  Similarly, Montano's only deposition testimony or statements in judicial proceedings the Court is aware of were those that took place in February of 1997, when Montano was deposed in a class action lawsuit challenging LANL's reduction-in-force.  Montano Aff. at ¶ 20.  As for statements that Montano allegedly made to individual defendants in the course of performing his job duties, this an impermissibly vague description because the Court cannot identify what the statements were or to whom they were made.  Furthermore, the Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S. Ct. 1951, 1960 (2006).

On the other hand, the Court concludes that certain speech by Montano is protected speech on a matter of public concern.  For example, his testimony in October of 2002 before the joint New Mexico-California legislative committee on LANL oversight regarding LANL's alleged violation of federal anti-discrimination laws is protected speech.  The same is true of Montano's October 2004 testimony before the New Mexico legislative committee on LANL oversight regarding LANL's alleged failure to release the SAPR reports to DOE and LANL's allegedly inadequate mechanism for resolving whistleblower complaints.  As this court has previously explained, under Supreme Court precedent speech is a matter of public concern if it is motivated by a desire to expose a public employer's malfeasance.  Montano's testimony before the two legislative committees appears to satisfy that criteria.  The fact that his speech took the form of sworn testimony in a legislative proceeding also lends it additional protection.  *See Lytle v. City of Haysville*, 138 F.3d 857, 864 n. 2 (10th Cir. 1998) (noting "[t]his circuit has concluded that a witness's sworn testimony in a court

proceeding is entitled to heightened protection under the First Amendment"). Montano's March 2004 filing of a DOE IG whistleblower complaint is also protected. Finally, Montano's disclosure to DOE IG of data underlying the SAPR Team's October 2003 reports is also protected speech, to the extent that he revealed the data in an effort to expose alleged improprieties, and if he did so in violation of directives from his LANL supervisors to keep the information away from DOE. *Delgado v. Jones*, 282 F.3d 511, 519 (7th Cir. 2002). The Court concludes that there is a genuine issue of material fact on these issues.

### B.    *Pickering* balancing test

As with Hook, Defendants do not argue that their interest in regulating Montano's speech outweighed his interest in his First Amendment rights or was otherwise necessary to prevent the disruption of official functions. Instead, Defendants contend that they simply did not restrict Montano's speech in any manner. The Court concludes that while it is a close question, there is a fact dispute on this element. Viewed in the light most favorable to Montano there exists sufficient evidence to support the conclusion that by removing work and responsibilities from Montano and the rest of the SAPR Team (see further discussion below), Defendants did in fact attempt to regulate and restrict his speech regarding problems at LANL.

### C.    Substantial or motivating factor

To prevail on a claim for retaliation, the employee must show the protected speech played a substantial part in the employer's decision to adversely alter the employee's conditions of employment. *Maestas v. Segura*, 416 F.3d 1182, 1188 (10th Cir. 2005). Thus, "[t]o withstand summary judgment at step three, therefore, an employee must produce evidence linking the employer's action to the employee's speech." *Id.* "An *employer's knowledge* of the protected speech, together with close temporal proximity between the speech and challenged action, may be

sufficiently probative of causation to withstand summary judgment." *Id.* (emphasis added).  *See also Morfin v. City of East Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003) (explaining that protected conduct cannot be a basis for retaliation where defendants did not know of such conduct).

### a.    adverse employment actions

Thus, the first question the Court must answer is whether there is a genuine issue of material fact regarding Montano's claim that the Defendants caused him to suffer an adverse employment action.   Montano contends that Defendants took the following adverse actions against him: (1) harassing him to change his audit findings; (2) acting in a hostile and unprofessional manner towards him; (3) removing his work; (4) restricting his authority; (5) giving him false and negative evaluations; (6) failing to pay him fairly in comparison with similarly-situated employees; and (7) driving him into a dead-end entry level position.  Doc. No. 145 at p. 25.

Most of these do not rise to the level of an adverse employment action, even under the more relaxed First Amendment standard.  For example, Montano points to absolutely no evidence supporting his contention that the Defendants harassed him about changing his audit findings, nor can the Court locate such evidence.[6]  Montano's assertion that Defendants acted in a "hostile and

---

[6] This is an excellent example of the wild goose chase on which Montano's response brief often leads the Court.  In support of his assertion of alleged harassment to change audit findings, Montano cites (s*ee* Doc. No. 145 at p. 27) to his response to paragraphs 28, 29, and 32 of Defendants' statement of undisputed material facts, wherein he in turn cites to evidence regarding Defendants alleged actions directed at individuals <u>other than</u> Montano.  He also discusses LANL's alleged attempts to cover up the SAPR reports or otherwise hide procurement problems, presumably in an effort to imply that these efforts to deceive the DOE were directed at <u>Montano</u> in an effort to get him to change the SAPR Team's reports.  Montano repeats this assertion in his deposition, in which he contends that LANL's failure to release the SAPR Team's work product to DOE constituted retaliation against him, even though he worked on the report at the behest of LANL and disposition of that work product was presumably LANL's decision.  Montano Depo. at pp. 66, 68-69.  Montano also argues that unspecified defendants made "repeated threats" to terminate him if he released the SAPR report to DOE.  Doc. No. 145 at p. 28.  Again, the Court can locate no evidence of such threats against Montano.  In short, the evidence that Montano cites either does not exist, or it does not pertain directly to him and would require the piling of inference upon inference, such that it is too attenuated to create a genuine issue of material fact.

unprofessional manner" towards him is extremely vague, leaving the Court to guess at what behavior Montano alleges was hostile and unprofessional.  Without more, it simply cannot rise to the level of an adverse employment action.  Similarly, Montano's assertion that Defendants "restricted his authority" is impermissibly vague; he does not enumerate what the nature and extent of his authority had been, how it was restricted, or by whom.  Next, the Court concludes that there is no evidence that any of the Defendants gave Montano a negative evaluation.[7]  Indeed, Montano has failed to bring forward any documentary evidence of a negative evaluation performed by any of the individual Defendants.  The evidence he does provide shows that he asked Marquez for the same "ORC" evaluation scores that he had received previously, and that his request was honored. He also avers that a non-party gave Montano credit on an evaluation for work that he did not do, and that the same evaluation failed to state that Montano had been idle for nine months.  While the evaluation may not have been entirely accurate, the Court cannot conclude that it constituted an adverse employment action against him.  Even more importantly, there is no evidence that any of the individual defendants participated in that evaluation.  In addition, as the Court has already discussed, *supra*, Montano has failed to come forward with admissible evidence to create a genuine issue of fact on whether he was underpaid relative to his peers.

Montano has presented evidence that Marquez[8] removed the SAPR Team (of which Hook was the leader) from the supervision of a division leader, placing it instead under Barr, a section

---

[7] The issue of what constitutes a negative evaluation was discussed in this Court's Memorandum Opinion and Order regarding defendant Chatterjee's motion for summary judgment on Montano's claims against her.  *See* Doc. No. 185 at pp. 21, 30-31.

[8] In his Affidavit [Doc. No. 117] at ¶ ¶ 14, 22-23, Marquez acknowledges that he led the organizational restructuring of BUS Division that led to its split into the CFO Division and SUP Division. One could infer from this evidence that he approved the placement of the SAPR Team under Barr's leadership in the SUP Division.

12

leader, several layers lower in the organization.[9]  Montano Aff. at ¶ 42; Hook Aff. at ¶¶ 41, 49, 73, 76, 81.  *See also* Hook 2d Supp. Aff. at ¶ 5-6.  As this Court has previously found, a jury might reasonably interpret this as a demotion for Hook, since he was the leader of the SAPR Team.  What is less clear is Montano's assertion that the reorganization was an adverse employment action for <u>him</u> and his fellow SAPR Team members who had no management authority.  Essentially, Montano contends that the reorganization constituted a de facto demotion  not only for Hook as the leader of the SAPR Team, but also for him, even though he suffered no change in grade or pay, he had no management authority (and therefore could lose none), and he continued to report to Hook.  Montano does not cite, nor can the Court find, any authority to support a claim that this constitutes an adverse employment action against Montano.

However, although Defendants hotly dispute the evidence on this issue and offer their own evidence to the contrary, the Court concludes that Montano has come forward with sufficient evidence to create a genuine issue of material fact as to whether the individual Defendants removed work responsibilities and duties from Montano.   For example, he has come forward with evidence that Marquez limited his and the SAPR Team's work to procurement issues and gave projects intended for SAPR to other employees.  Montano Aff. at ¶ 43, 46,47, 56, 59.  Montano has also submitted evidence that Bretzke, Brown, and Barr[10] all participated or concurred in the reduction of his work assignments.  Montano Aff. at ¶ 44,57, 72.  Hook's affidavit also substantiates the lack of work given to the SAPR Team, including Montano.  Hook Aff. at ¶ 55, 58, 72, 74, 81-83, 87.

---

[9] However, Montano has presented no evidence that Bretzke, Brown, or Barr participated in any way in the administrative reorganization that led to the asserted demotion of Hook and the SAPR Team.

[10] Though not a LANL manager with authority to make management decisions, Barr did have the power to assign work to the SAPR Team.  Barr Aff. at ¶¶ 6, 11.

        **b.**       **motivating factor**

It is not enough for Montano to demonstrate that he engaged in protected speech and that he suffered an adverse employment action at the hands of Defendants. He must also demonstrate the existence of a genuine issue of material fact on the question of whether his protected speech on a matter of public concern motivated the adverse employment action in question. This includes demonstrating that the Defendants each knew about his protected speech.

As discussed above, the record is devoid of evidence that Defendants Bretzke, Barr, or Brown knew about Montano's protected speech. Therefore, as to these three defendants, there is no genuine issue of material fact on this element of the claim, and no need to proceed with the qualified immunity analysis. Defendants Bretzke, Barr, and Brown are entitled to summary judgment on Montano's First Amendment retaliation claims against them.

With regard to Marquez, in early 2002 Montano told him directly about his 1996 whistleblower complaint, which is the subject of a binding settlement. Montano Supp. Aff. at ¶ 2. Further, Marquez has admitted to knowing that Montano had a "public persona" and that he was known for "raising issues on behalf of LANL employees." Marquez Interview,[11] attached as Ex. C to Doc. No. 145, at p. 65. However, this is far from an admission of knowing about any of the specific instances of Montano's protected speech discussed above. In addition, Montano makes much of a timeline/matrix written by Marquez that juxtaposes certain communications by Hook and Montano with other events within LANL, implying that document demonstrates that Marquez not only knew about Montano's protected speech, but also tracked it and associated it with certain events. *See* Ex. D to Doc. No. 145. The implication is that Marquez was tracking Montano's

---

[11] Though unsworn, Marquez's statements in the interview are admissible into evidence as statements by a party opponent.

protected speech and reacting adversely to it.  However, a review of Marquez's timeline does not confirm that interpretation.  In fact, very little of the timeline refers to Montano, and the small amount that does references certain emails authored by Montano, not his protected speech as discussed above.  In short, it does not show that Marquez removed work duties from Montano based upon his protected speech.

Viewing the evidence in the light most favorable to Montano, the Court concludes that a jury could not reasonably infer both knowledge and bad motive by Marquez, and that there is no genuine issue of material fact as to whether Marquez' actions in removing work from Montano and the SAPR Team were motivated by Montano's protected speech.  Thus Defendant Marquez is entitled to summary judgment on Montano's First Amendment retaliation claim against him.

Having concluded that the Defendants did not violate Montano's First Amendment rights, it is unnecessary to reach the second part of the qualified immunity analysis under *Saucier v. Katz*, 533 U.S. 194, 200 (2001), that being, whether that First Amendment right was clearly established at the time.

## II.    CALIFORNIA WHISTLEBLOWER PROTECTION ACT CLAIM

As was the case in their motion for summary judgment on Hook's claims, the individual Defendants merely state in conclusory fashion that they are entitled to summary judgment on Montano's California Whistleblower Protection Act ("CWPA") claim in Count II of the Amended Complaint.  Because the Defendants failed to address the legal standards pertaining to claims under the CWPA, and whether Montano's claim survives a motion for summary judgment under those standards, the Court will deny their motion for summary judgment.

**IT IS THEREFORE ORDERED** that *Defendants Marquez, Bretzke, Brown, and Barr's*

15

*Motion for Summary Judgment on Claims by Charles Montano Based on Qualified Immunity & Other Grounds* [Doc. No. 110] is **GRANTED IN PART** and **DENIED IN PART**.  As explained above, Defendants are entitled to summary judgment on Montano's claims for violation of his First Amendment rights under 42 U.S.C. § 1983, but they are not entitled to summary judgment on his claim under the California Whistleblower Protection Act.

_____
JUDITH C. HERRERA
UNITED STATES DISTRICT JUDGE